ANGEL S. SIFRE, JOSÉ DÁVILA RICCI, LUIS RECHANI AGRAIT, ENRIQUE GATELL y JOAQUÍN A. BURSET, miembros que componen la COMISIÓN HÍPICA INSULAR, peticionarios, *v.* DANIEL PELLÓN, JR., JUEZ INTERINO DE LA CORTE DE DISTRITO DE SAN JUAN, y MANUEL C. ROLÁN, demandados.

Núm. 74.—*Sometido:* Marzo 14, 1939. *Resuelto:* Abril 12, 1939.

* NOTA: Véase el prefacio.

*Diego O. Marrero,* abogado de los peticionarios; *Celestino Iriarte,
F. Fernández Cuyar* y *H. González Blanes,* abogados del demandado Rolán.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

Manuel C. Rolán radicó una solicitud de *injunction* en la Corte de Distrito de San Juan contra la Comisión Hípica Insular, en la que sustancialmente alegó:

Que es dueño de una cuadra de caballos de carreras, entre los cuales se hallan los ejemplares Joan Crawford, Mae West y Myrna Loy, inscritos todos en la Comisión Hípica Insular. Que el 25 de enero de 1937 adquirió los tres ejemplares antes mencionados por compra a un potrero de Culebra debidamente registrado en la Comisión Hípica Insular, perteneciente a la Sucesión Nieves & Castrillón. Que cuando el peticionario adquirió dichos tres ejemplares, ya estaban éstos inscritos en los libros de la Comisión Hípica Insular como caballos del país y habían sido inspeccionados, aprobados y marcados como tales por los oficiales de dicha Comisión. Que el valor de dichos caballos excede de $5,000, y que tres meses después de haberlos adquirido fué notificado por la demandada con copia de una resolución por ella dictada, a virtud de la cual se le prohibió inscribirlos para tomar parte en las carreras que se celebraren en los hipódromos de Puerto Rico, prohibiéndole además la venta, cesión o traspaso de dichos equinos, hasta tanto se substanciase una investigación que, según la demandada, hacía algún tiempo venía practicando, a fin de determinar el origen de los referidos caballos. Que se le notificó además, el 16 de mayo de 1938, otra resolución de la demandada por la cual se suspendió el pago al peticionario de la suma de $480, correspondiente al primer

premio ganado por el ejemplar Joan Crawford en la carrera efectuada el 17 de julio de 1937, es decir, aproximadamente un año antes de dictarse la referida resolución. Que el 24 de mayo de 1938 el peticionario recibió copia de una "Orden para Mostrar Causa", expedida por la demandada, citándole para comparecer ante ella el 9 de junio siguiente para mostrar causas por las cuales no deberían cancelarse en el "Registro de Potros" y "Registro de Caballos de Carreras" las inscripciones de las tres potrancas tantas veces aludidas, expresando como fundamento de dicha orden que aquéllas no habían nacido en Puerto Rico, según había certificado anteriormente la propia demandada, y que los informes, declaraciones y documentos presentados a la demandada por el anterior dueño de los tres ejemplares en relación con la procedencia de los mismos eran falsos y fraudulentos. Que celebrada la vista el 9 de junio de 1938, la demandada dictó resolución con fecha 30 de noviembre siguiente, por la cual ordenó la cancelación definitiva de dichas potrancas en el *Stud-Book,* así como su cancelación en el "Registro de Caballos de Carreras", fundándose en que el anterior dueño de ellas había obtenido su inscripción fraudulentamente. Que la citada resolución de 30 de noviembre último es nula, arbitraria, confiscatoria e irrazonable, y que privó al peticionario de sus derechos de propiedad sobre dichos animales sin el debido proceso de ley, por las siguientes razones:

"(*a*) Porque la querellada no tenía jurisdicción ni facultad ni poder alguno para dictar dicha orden o resolución, toda vez que no tuvo ante sí *ninguna* evidencia competente para probar las alegaciones de fraude por ella establecidas.

"(*b*) Porque no obstante disponer la ley que la inscripción de un caballo en el *Stud-Book* es permanente y sólo podrá ser eliminada por la querellada por justa causa y previa audiencia de las partes interesadas concediéndose a éstas oportunidad de defenderse, en el presente caso ni existió causa de ninguna especie ni se celebró la audiencia requerida por la ley, habiendo la querellada negado reiteradamente al peticionario la oportunidad de defenderse, a pesar de haberla éste solicitado en repetidas ocasiones.

"(c) Porque dicha resolución se funda exclusivamente en las declaraciones de supuestos testigos llamados Federico Santiago, William W. Vaughan, Arthur Cromwell, James H. Anderson, James Kaney, Harry Wakoff y otros, cuyos testigos no estuvieron presentes en ningún momento durante la celebración de la vista, ni prestaron declaración, ante la querellada, la cual negó al peticionario reiteradamente su derecho a ver, confrontarse con y repreguntar a dichos testigos, no obstante las solicitudes repetidas hechas a tal efecto por el peticionario."

Alegó además el peticionario:

"Que él compró los ejemplares de carrera mencionados en esta petición al potrero de la Sucesión Nieves & Castrillón como ejemplares del país, confiando en los certificados expedidos por la propia querellada acreditando la procedencia de dichos ejemplares como del país, y a base de los archivos, registros y libros de la propia querellada en los cuales consta la inspección de dichos ejemplares que verificaron los funcionarios y el veterinario oficial de la querellada, así como la marca estampada en el cuello de dichos ejemplares por el referido veterinario oficial designado por la querellada; y alega asimismo que escasamente tres meses después de haber comprado dichos ejemplares, la querellada prohibió su inscripción en las carreras que se celebrasen en los hipódromos de Puerto Rico, y prohibió su venta, cesión, traspaso o enajenación en forma o manera alguna, por lo que hace ya cerca de diez meses el peticionario se ha visto privado no solamente de inscribir dichos ejemplares en las carreras, y en esta forma de obtener los premios correspondientes, sino aún de poder disponer de su propiedad, y asimismo se ha visto obligado a sufragar los gastos de manutención, cuidado y vigilancia de estos ejemplares, sin poder usarlos en forma o manera alguna.

"Que ha satisfecho a la querellada todos los derechos exigidos por la ley para la reinspección de estas tres potrancas, así como para el registro de ellas a nombre del peticionario, sin que en ningún momento antes de comprar dichas potrancas la querellada advirtiese al peticionario sobre la supuesta falsedad de los certificados de inscripción expedidos por la propia querellada.

"Que por ministerio de la ley la expulsión de un caballo implica una prohibición de venderlo, cederlo, traspasarlo o enajenarlo en forma alguna a ninguna persona, sociedad o establo, y asimismo implica que los demás caballos, propiedad de la misma persona, así como todos aquellos otros caballos en que esté interesada tal persona, quedan afectados por la referida expulsión, por lo que, siendo el peti-

cionario dueño de establo de caballos de carrera, denominado Don Stable, la orden o resolución antes referida afecta no sólo a las tres potrancas llamadas Mae West, Joan Crawford y Myrna Loy, sino asimismo a todos los demás caballos de carrera propiedad de dicho establo.

"Que de ser puesta en vigor la orden o resolución anteriormente referida, sus derechos de propiedad sobre las potrancas mencionadas, así como sobre todos los demás caballos pertenecientes al Don Stable, quedarán destruídos, toda vez que dichos caballos no tienen valor alguno excepto como caballos de carrera, quedando igualmente destruídos los derechos de propiedad del peticionario sobre los demás caballos de carrera que integran el Don Stable, causándosele así a este peticionario daños irreparables y daños y perjuicios cuya cuantía resulta sumamente difícil de precisar, ya que no pueden estimarse en ninguna forma los premios que, de participar dichos caballos en las carreras que se celebran en los hipódromos de Puerto Rico, pudieran corresponderles.

"Que carece de recurso alguno rápido, adecuado y eficaz en derecho para impedir que la querellada ponga en vigor la orden o resolución anteriormente referida, no obstante ser ésta nula, confiscatoria e irrazonable, toda vez que no existe derecho de apelación contra la referida orden o resolución."

Termina la solicitud de *injunction* con la siguiente súplica:

"Por tales razones el peticionario a esta Honorable Corte respetuosamente suplica se sirva dictar un auto permanente y definitivo de *injunction* prohibiendo a la querellada o a cualquiera de sus miembros el que por sí, o por medio de sus agentes, empleados, subalternos, o por medio de cualquier otra persona, ponga en vigor su resolución u orden fechada 30 de noviembre de 1938, mediante la cual se ordenó cancelar la inscripción en el *Stud-Book* de las potrancas Mae West, Coronela y La Gallega, y además cancelar definitivamente la inscripción en el Registro de Caballos de Carreras de las mismas potrancas, las cuales figuran con los nombres de Mae West, Myrna Loy y Joan Crawford.

"Solicita asimismo el peticionario que en tanto se sustancia y resuelve definitivamente la solicitud de *injunction* permanente anteriormente formulada, se sirva esta Hon. Corte ordenar la expedición de un auto de *injunction* preliminar conteniendo las mismas prohibiciones relacionadas, mediante prestación por el peticionario de una fianza buena y suficiente, en la cuantía que señale esta Hon. Corte,

para responder a la querellada de los daños y perjuicios que pudiere causarle la expedición de dicho auto preliminar de *injunction*.

"Suplica además el peticionario que mientras se resuelva la solicitud de *injunction* preliminar aquí formulada, expida esta Hon. Corte una orden de entredicho dirigida a la querellada y conteniendo las mismas prohibiciones aquí enumeradas, condicionada a la prestación de fianza buena y suficiente por el peticionario, en la cuantía que fije este Hon. Tribunal, para responder a la querellada de los daños y perjuicios que pudiere causarle la orden de entredicho referida.

"Finalmente el peticionario solicita de esta Hon. Corte que al dictar sentencia en estos autos, condene a la querellada y a cada uno de sus miembros a pagar al peticionario las costas, gastos y desembolsos del presente litigio, más una suma razonable para honorarios de abogados."

Con vista de la solicitud de *injunction* antes reseñada, la Corte de Distrito de San Juan, por su Juez interino, Hon. Tomás Torres Pérez, dictó, el 27 de diciembre último, una "Orden para Mostrar Causa y de Entredicho," previa prestación de fianza por la·cantidad de $1,000, prohibiendo a la demandada y a cada uno de sus miembros (nombrándolos), que por sí o por medio de sus agentes, empleados, etc., pongan en vigor la referida resolución, y que una vez prestada y aprobada la referida fianza, se notifique dicha orden en forma legal a la demandada para su cumplimiento, apercibida de desacato si la desobedeciere. Dispuso además la corte que la demandada fuese notificada con copia de la solicitud de *injunction* y de la orden de entredicho, para que si lo estimaba conveniente compareciese ante el tribunal el 9 de enero último, a las 9:00 a.m., a exponer las razones que tuviere por las cuales no debía concederse el *injunction* preliminar solicitado. Tres días después de dictada la orden de entredicho, Manuel C. Rolán radicó una moción en la misma corte solicitando que, previo los trámites legales, la Comisión y sus miembros fuesen castigados por desacato por haber desobedecido la referida orden. Inmediatamente se dictó la orden interesada por Rolán, disponiendo que la Comisión Hípica Insular y sus miembros (se nombran) compareciesen ante

la corte inferior el 5 de enero de 1939, a las nueve de la mañana, para que mostrasen causas, si algunas tuvieren, por las cuales no deberían ser castigados por desacato.

En la fecha anteriormente indicada comparecieron los demandados y radicaron una "Contestación a la moción sobre citación por desacato", y una "Moción para que se desestime la solicitud de *injunction* y se levante la orden de entredicho por falta de jurisdicción de la corte."

Es innecesario, a los efectos de esta opinión, reseñar el contenido de dichas dos alegaciones, excepto en cuanto a aquella parte de la primeramente mencionada en que bajo el título de "Defensas especiales" alegaron los demandados que la corte inferior carecía de jurisdicción para dictar la orden de entredicho, y en cuanto a aquella parte de la moción mencionada en segundo término, en que se exponen las razones de la demandada para sostener tal falta de jurisdicción de la corte para dictar la referida orden de entredicho.

Celebrada la vista del incidente de desacato, el Juez, Hon. T. Torres Pérez, concedió a las partes un término para que sometiesen por alegatos la cuestión sobre desacato y a la vez dejó sin efecto el señalamiento previamente fijado para el 9 de enero para la vista del *injunction* preliminar, señalándolo para el 23 del mismo mes. No se celebró la vista del *injunction* preliminar el 23 de enero, ni tampoco se ha resuelto, según aparece de los autos, el incidente de desacato, por lo que, a moción del demandante en el caso de *injunction*, se señaló por el Hon. Juez interino Sr. Daniel Pellón, la vista del *injunction* preliminar para el día 24 de febrero último. Se opuso al señalamiento la Comisión Hípica Insular, alegando que debía esperarse la resolución del incidente de desacato. El juez últimamente citado denegó la reconsideración de la orden señalando el *injunction* preliminar para la fecha indicada.

Fué con motivo de esta negativa que con fecha 17 de febrero último los aquí peticionarios radicaron en este tribunal la solicitud de auto inhibitorio, en la que después de

referirse a las distintas mociones y órdenes anteriormente reseñadas, de las cuales acompañaron copia a la solicitud, marcándolas como *exhibits,* e insistiendo siempre en la falta de jurisdicción de la corte inferior para expedir el auto de *injunction* interesado por Rolán, terminan con la siguiente súplica:

"Por todas las razones anteriormente expuestas, los peticionarios a la Hon. Corte suplican se sirva dirigir un auto inhibitorio al Hon. Daniel Pellón, Jr., Juez Interino de la Corte de Distrito de San Juan, y a Manuel C. Rolán, peticionario en el caso civil núm. 30896, para que desistan y se abstengan de llevar procedimiento alguno a efecto y especialmente el celebrar la vista de *injunction* preliminar fijada para el día 24 de febrero de 1939; y que asimismo comparezcan ante esta Hon. Corte a exponer los motivos por los cuales no deban ser absolutamente impedidos de cualquier procedimiento ulterior en dicho caso civil núm. 30896, hasta tanto se dictare una nueva orden por esta Hon. Corte, y que esta Hon. Corte dicte asimismo un auto de *certiorari* para revisar la actuación de la Corte de Distrito de San Juan, en virtud de la cual se dictó la orden de entredicho de fecha 27 de diciembre de 1938, cuya copia se acompaña como *exhibit* B, y previo el trámite correspondiente dicte resolución definitiva anulando dicha orden."

Con vista de la petición de auto inhibitorio y documentos anexos antes mencionados, este tribunal dictó resolución el 20 de febrero último por la que ordenó la expedición de un mandamiento en la forma ordinaria, dirigido al Hon. Daniel Pellón, Jr., Juez, y a Manuel C. Rolán, peticionario en la demanda de *injunction,* para que se abstuvieran de llevar a efecto procedimiento alguno en dicho caso, y especialmente de celebrar la vista del *injunction* preliminar fijada para el día 24 de febrero, y que mostraran causas, el 6 de marzo siguiente, a las dos de la tarde, por las cuales no debería absoluta y definitivamente impedírseles actuar en tal forma.

Celebrada la vista ante este tribunal en la fecha señalada con asistencia e informe oral de ambas partes, se les concedió plazo para alegato, quedando el caso finalmente sometido a nuestra consideración el 14 del mes pasado.

■ Es obvio que el solo hecho de estar pendiente de resolución un incidente de desacato por violación de una orden de entredicho no impide que continúen los procedimientos en el pleito de *injunction*. Por el contrario, si se resuelve primero la improcedencia del *injunction* preliminar, facilitaría la decisión en el incidente de desacato, pues en caso de resolverse que la orden decretando el *injunction* fué dictada sin jurisdicción como alegan los peticionarios, la orden de entredicho sería nula y, siendo nula, su desobediencia no constituiría desacato, pues nadie está obligado a obedecer una orden dictada sin jurisdicción.

En el caso *Ex parte Le Hardy,* 17 D.P.R. 1024, 1029, se dijo por este tribunal:

"Es cierto que una orden ilegal de una corte, por haberse dictado sin jurisdicción o extralimitándose en ella, no hay obligación de respetarla y su desobediencia no apareja castigo por desacato, según hemos resuelto ya en el caso de *Laura Núñez* v. *el Juez de la Corte de Distrito de Mayagüez* en procedimiento de *certiorari* resuelto el 20 de marzo de 1908, ya que para que se cometa desacato es necesario que se desobedezca voluntariamente una orden legal librada con jurisdicción sobre la materia litigiosa y sobre las partes litigantes."

Véanse además *Asamblea Municipal* v. *Corte de Distrito,* 36 D.P.R. 702, *Reyes Delgado* v. *Corte,* 41 D.P.R. 902, y *Pérez Guerra* v. *Matos,* 48 D.P.R. 599.

■ En la alegación sexta de la solicitud de auto inhibitorio, los peticionarios exponen las razones en que se fundan para sostener que la corte inferior carece de jurisdicción para conocer de y resolver el *injunction* preliminar. A ese respecto alegan los peticionarios que la resolución de la Comisión Hípica de 30 de noviembre de 1938 que motivó la demanda de *injunction* radicada por Manuel C. Rolán en la corte inferior, fué el resultado de una investigación llevada a cabo por dicha Comisión de acuerdo con el artículo 9 de la Ley Hípica, según fué enmendado por la Ley núm. 108 de 6 de mayo de 1938, y que por disposición expresa de dicho precepto es un acto administrativo de la Comisión contra el cual, según los

peticionarios, no puede interponerse recurso alguno ante los tribunales, por no conceder la ley remedio alguno contra tales resoluciones.

El artículo 9 antes citado en que descansan los peticionarios, según ha sido enmendado por la Ley núm. 108 de 6 de mayo de 1938 (Leyes de ese año, pág. 239), dice así:

"Artículo 9.—Toda persona natural o jurídica que por cualquier medio intente obtener u obtenga una *inscripción en cualquiera de los registros* de la Comisión Hípica Insular de un caballo importado haciéndolo aparecer como nacido en el país, será culpable de delito menos grave (*misdemeanor*) y castigado con una pena no menor de *seis* (6) meses de cárcel o quinientos dólares de multa, o ambas penas, a discreción del tribunal; *Disponiéndose, que el período de tiempo para la formulación de la denuncia será el de tres (3) años a partir de la fecha en que la Comisión Hípica Insular haya comenzado su investigación sobre el origen del caballo de que se trate.*

"*La Comisión Hípica Insular queda por la presente facultada para eliminar de sus registros a cualquier caballo que se hubiere inscrito en contravención a lo que se dispone en el presente artículo, así como también para cancelar la licencia si el que lo hubiera inscrito tuviera una licencia de dueño de caballos,* UNA VEZ HAYA SUBSTANCIADO LOS CORRESPONDIENTES PROCEDIMIENTOS; *Disponiéndose, que cuando a juicio de la Comisión Hípica Insular hubiesen motivos para creer que un caballo importado hubiera sido inscrito en cualquiera de los registros de la comisión como nacido en el país, podrá suspenderlo de tomar participación en las carreras que se celebren hasta tanto se hubiera dictado una resolución definitiva; Disponiéndose, además, que la Comisión Hípica Insular queda autorizada para no aprobar traspaso alguno en sus registros en relación con un caballo incurso en las disposiciones de este artículo mientras no se haya dictado una resolución definitiva en cuanto a su origen.*"

Es verdad que el artículo 9 transcrito autoriza a la Comisión Hípica Insular para eliminar de sus registros a cualquier caballo que se hubiere inscrito en contravención a sus disposiciones, y que también la autoriza para cancelar la licencia si el que lo hubiere inscrito tuviere una de dueño de caballos; pero no es menos cierto que de estas facultades sólo puede hacer uso la Comisión "*una vez haya substanciado los correspondientes procedimientos.*" ¿Y cuáles son "los

correspondientes procedimientos''? La respuesta la encontramos en el artículo 7 de la propia ley, que preceptivamente dispone que para cancelar *"cualquiera de las licencias expedidas por la Comisión Hípica Insular, ésta concederá a la parte una previa audiencia y oportunidad de defenderse"*, disponiendo además el artículo 28 del reglamento de la propia Comisión lo siguiente:

"La inscripción de un caballo en el *stud-book* de la Comisión Hípica Insular se considerará permanente y *sólo podrá ser eliminada por la Comisión Hípica Insular por justa causa y previa audiencia de las partes interesadas.*"

No podemos convenir con los peticionarios en que resoluciones de la índole de la dictada con fecha 30 de noviembre último sean resoluciones administrativas. Una resolución de una Comisión, sea cual fuere la naturaleza de ésta, dictada a base del poder concedídole por la Asamblea Legislativa para decidir en relación con la propiedad o derechos de los ciudadanos, después de oír a las partes interesadas, es una resolución cuasi judicial y no administrativa como pretenden los peticionarios. Véanse *Baker* v. *Gooding County* (1914) 25 Idaho 506, 138 P. 342; *Robinson* v. *Sup. of Sacramento* (1860) 16 Cal. 208.

En el caso de *City of Macon* v. *Anderson* (1923) 155 Ga. 607, 117 S.E. 753 (auto de error, desestimado en (1925) 269 U.S. 592, 70 L. ed. 429), se resolvió que era procedente el auto inhibitorio para impedir que un consejo municipal conozca de ciertos cargos para la destitución de un miembro de su Junta de Comisionados de Acueducto, puesto que la función del consejo en tales procedimientos era judicial.

Véanse también *Beavers* v. *Armistead* (1923) 156 Ga. 833, 120 S.E. 526; *Speed* v. *Detroit*, 98 Mich. 360, 57 N.W. 406; *Glover* v. *City Council of Columbus* (1923) 132 Miss. 776, 96 So. 521, y *O'Donnell* v. *Morrissey* (1934) 151 Misc. 315, 272 N.Y. Supp. 451.

La procedencia del auto inhibitorio depende de que la corte inferior tenga jurisdicción para conocer del *injunc-*

*tion* solicitado por Rolán contra los peticionarios, y para determinar tal cuestión tenemos que recurrir a la solicitud de *injunction* a base de la cual la corte inferior dictó la orden de entredicho y se proponía considerar la expedición del *injunction* preliminar. Si de la faz de las alegaciones de la solicitud de *injunction* aparece que la corte carece de jurisdicción para conocer del caso, claro es que el auto inhibitorio es procedente; pero si por el contrario de la faz de la solicitud de *injunction* aparece que la corte inferior tiene jurisdicción, o que aún no teniéndola, la resolución de la corte inferior concediendo el *injunction* preliminar es revisable mediante el recurso de apelación, en cualquiera de dichos dos casos procede denegar el auto inhibitorio. Artículos 664 y 666 del Código de Enjuiciamiento Civil, edición 1933.

Conocemos las alegaciones de la solicitud de *injunction* por haberlas reseñado al principio de esta opinión. De ellas resulta que la resolución dictada por la Comisión el 30 de noviembre de 1938 tuvo por base exclusivamente las declaraciones de ciertos testigos que no estuvieron presentes ante la Comisión, privando así al demandado Rolán del derecho a confrontarse con ellos y repreguntarlos, a pesar de sus insistentes requerimientos a ese efecto. Aceptando que estas alegaciones de la solicitud de *injunction* sean ciertas, pues como tales tenemos que considerarlas a los efectos de determinar la jurisdicción del tribunal inferior para conocer de dicho asunto, ¿cuándo y en qué momento cumplió la Comisión con el precepto terminante del artículo 7 de la Ley Hípica dispositivo de que "para cancelar cualquiera de las licencias expedidas por la Comisión Hípica Insular, ésta concederá a la parte un previa audiencia y oportunidad de defenderse"? ¿Por qué motivo tenían que suspenderse en perjuicio del demandante en el caso de *injunction* los efectos del reglamento de la propia Comisión Hípica, dispositivo de que la inscripción de un caballo en el *stud-book "sólo podrá ser eliminada por la Comisión Hípica Insular por justa causa y previa audiencia de las partes interesadas"*? El mismo ar-

tículo 9 que invoca la Comisión, al facultarla para eliminar de sus registros cualquier caballo ilegalmente inscrito y para cancelar la licencia de su dueño, si la tuviere, dispone que dicha Comisión podrá hacerlo *"una vez haya substanciado los correspondientes procedimientos."* ¿Puede concebirse dentro de un gobierno de leyes como el nuestro un procedimiento tan arbitrario, especialmente cuando el poder legislativo, al delegar tales facultades a la Comisión lo hace bajo la condición de que deberá oír a la parte perjudicada y darle oportunidad de defensa? ¿Qué oportunidad de defensa tuvo el interesado, si ni siquiera se le permitió confrontarse y repreguntar a los testigos contrarios?

Se dice por los peticionarios que las licencias o prerrogativas de que ha sido privado Rolán no constituyen derechos adquiridos, sino meros privilegios de que puede ser privado en cualquier momento. Admitimos que la Asamblea Legislativa, de quien emanan tales privilegios o licencias, tiene el poder de cancelarlas en cualquier momento sin necesidad de conceder audiencia alguna al interesado; pero cuando ese poder legislativo es delegado a un funcionario, junta o comisión administrativa, para que la delegación sea constitucional es preciso que el legislador declare las normas y establezca los principios legales por los cuales habrá de regirse el delegado al hacer uso de la facultad que se le confía, quedando así limitadas sus funciones a determinar si los hechos investigados justifican la aplicación de las normas o principios legales declarados por el legislador. *Mutual Film Corp.* v. *Ohio Industrial Comm.,* 236 U.S. 230, 239, 59 L. ed. 552; *Thompson* v. *Smith,* 71 A.L.R. 604, 154 S.E. 579. Hemos visto que nuestra Asamblea Legislativa, al obligar a la Comisión Hípica Insular, a través de la Ley Hípica, las facultades que ahora invoca, le impuso la norma de no cancelar tales licencias o privilegios sin conceder previamente al interesado una audiencia y oportunidad de defenderse. Artículos 7 y 9 de la Ley Hípica. De manera, pues, que para el ejercicio legítimo de las facultades así delegádasle, la Comi-

sión Hípica Insular tiene que ajustarse a las condiciones que le impone la ley. Si, olvidándolas, actúa en exceso de sus facultades, opresiva o arbitrariamente, causando daños irreparables, aunque la ley guarde silencio sobre el remedio adecuado, el auto de *injunction* es el procedente para mantenerla dentro de los linderos de su autoridad. *Purnell* v. *Maysville Water Co.*, 23 A.L.R. 223, 234 S.W. 967. Véase también la monografía en 112 A.L.R. 965, y casos citados.

En el caso de *Arana* v. *Comisión Hípica*, 35 D.P.R. 745, 753, interpretando preceptos similares de una ley anterior, este tribunal, por voz de su Juez Asociado Sr. Hutchison, dijo:

"No hallamos nada en estos artículos que sostenga la conclusión que de ellos se desea inferir. Pero aún si se pudiera dar la interpretación sugerida por la apelante, la Comisión no tiene poder para derogar el artículo 12 ó cualquier otra disposición específica de la ley que la creó. El expulsar un caballo o tachar su nombre del *studbook* equivale en ese sentido a revocarle la licencia al dueño. Si a un dueño, sin notificársele ni dársele oportunidad de ser oído, puede privársele del derecho de correr sus caballos, el estatuto que requiere tal notificación y vista como un requisito indispensable antes de revocarse una licencia no tendría efecto alguno."

Y recientemente, en el caso de *Hernández* v. *Comisión Hípica*, 50 D.P.R. 100, 102, este tribunal, por voz del Juez Asociado Sr. Wolf, interpretando preceptos sustancialmente iguales a los de la vigente Ley Hípica, se expresó en los siguientes términos:

"La ley que regía el hipismo en Puerto Rico en la época en que ocurrió este caso, lo era la núm. 11 de 1932 (pág. 195), que autorizaba a la Comisión Hípica Insular a formular ciertas reglas y a delegar poder para actuar a un jurado designado por la Comisión para la supervisión directa de las carreras. Al amparo de la facultad concedídale por esta Ley, la Comisión Hípica formuló la regla 96 para los jurados, el inciso (*h*) de la cual lee así:

" '(*h*) Antes de imponer castigo alguno, deberá practicar, hasta donde sea posible, una investigación de los hechos denunciados, tomando todas las declaraciones bajo juramento y dando la oportunidad al querellado de ser oído en su defensa.'

"Convenimos en que no fué la intención de los redactores de dicho inciso que se observaran todas las solemnidades de un juicio. El jurado de un hipódromo no está en condiciones de celebrar un juicio completo. Estamos muy convencidos de que se exigían muchas menos formalidades. Creemos que bastaría que los testigos y el acusado fuesen citados, juramentados y examinados de manera informal y que se le diera al *jockey* la oportunidad de llamar a otros testigos, quizá a algunos de los otros *jockeys* que tomaron parte en la carrera. Sea esto como fuere, al demandante apelado no se le dió oportunidad de defenderse. *Lo que le sucedió a Hernández fué algo más parecido a lo que ocurre a la terminación de ciertos juicios criminales, cuando la corte le pregunta al acusado si tiene alguna razón que alegar para que no se dicte sentencia. Si procede un injunction por dejar de cumplir con las disposiciones de la regla 96 supra, éste es un caso que claramente cae bajo la misma.*" (Bastardillas nuestras.)

■■ Sobre la suficiencia de la audiencia y oportunidad de defensa, conviene, por ser de perfecta aplicación a la cuestión que ahora nos ocupa, referirnos al caso de *Int. Com. Comm.* v. *Louisville & Nashville* R.R., 227 U.S. 88 (57 L. Ed. 431). En dicho caso New Orleans Board of Trade instó tres procedimientos separadamente contra Louisville & Nashville R.R., interesando de la Comisión de Comercio que dejase sin efecto por injusta, irrazonable y discriminatoria cierta tarifa de precios. Contestó la compañía ferrocarrilera. Se celebró una audiencia, se ajustaron las tarifas por estipulación de las partes, y en 31 de diciembre de 1909 la Comisión, por una simple orden en la que declaró que las tarifas eran irrazonables, dispuso que se restableciesen las anteriores y que se hiciese la correspondiente reducción en las mismas. La compañía ferrocarrilera radicó entonces, en 26 de enero de 1910, una demanda en equidad en la Corte de Circuito de los Estados Unidos para el Distrito Occidental de Kentucky, solicitando que se impidiese a la Comisión poner en vigor dicha orden, calificada por la demandante de arbitraria, opresiva y confiscatoria, y de que privaba a la compañía de su propiedad y derecho a hacer tarifas, sin el debido procedimiento de ley. La Corte de Circuito denegó el *injunction* preliminar.

Más tarde el caso fué trasladado a la Corte de Comercio (*Commerce Court*), habiéndose hecho parte a los Estados Unidos. En dicho tribunal, además de la evidencia que tuvo ante sí la Corte de Circuito, la compañía presentó toda la que se había introducido ante la Comisión, a fin de probar que la evidencia no demostraba en manera alguna que las tarifas impugnadas fueran irrazonables. En una extensa opinión de la Corte de Comercio (un juez disintió) se sostuvo que la orden de la Comisión era nula porque materialmente no existía evidencia para sostenerla. En la apelación que se interpuso para ante el Tribunal Supremo de los Estados Unidos, insistió el Gobierno en que de acuerdo con los preceptos de la Ley Hepburn de 1906, las tarifas pueden ser canceladas *"si después de una audiencia la Comisión es de opinión que son irrazonables."* Se insistió en que la orden basada en tal opinión era concluyente (a pesar de lo resuelto en contrario en el caso de *Com. Comm.* v. *Union Pac. R.R.,* 222 U.S. 541, 547 (56 L. Ed. 308), y que no podía ser anulada aunque la conclusión no estuviese sostenida por la prueba.

Resolviendo la cuestión, dijo el Tribunal Supremo:

"Pero el estatuto concedió el derecho a una amplia audiencia (*full hearing*) y esto confería el privilegio de introducir testimonio a la vez que imponía el deber de decidir *de acuerdo con los hechos probados.* Una conclusión que no está sostenida por la evidencia es arbitraria y completamente desprovista de fundamento. Si la contención del Gobierno fuese correcta, la Comisión podría hacer caso omiso de todas las reglas de evidencia y caprichosamente formular conclusiones (*make findings*) por *fiat* administrativo. Tal autoridad, no obstante lo beneficiosamente que pudiera ejercitarse en un caso determinado, podría ser perjudicialmente ejercitada en otro; es inconsistente con la justicia racional y cae dentro del anatema constitucional contra todo ejercicio arbitrario de poder.

"En los relativamente pocos casos en que tales cuestiones se han suscitado, se ha reconocido claramente que las órdenes administrativas de carácter judicial son nulas si no se ha concedido una audiencia o si la que se hubiere concedido ha sido injusta, o si la conclusión fuere contraria a la evidencia no controvertida. (Citas.)"

Finalmente el Tribunal Supremo revocó la sentencia de la Corte de Comercio, no porque la Comisión tuviera los arbitrarios poderes que alegaba tener, sino porque al considerar el caso en su fondo llegó a la conclusión de que la Comisión, al restablecer las anteriores tarifas, no había actuado arbitrariamente, sino basada en evidencia sustancial, aunque contradictoria, y siendo ello así debía prevalecer la conclusión de hecho a que llegó la Comisión al dirimir el conflicto de la evidencia, puesto que los tribunales no deben sustituir su criterio por el de aquellas comisiones a quienes les está confiada la facultad de establecer tarifas, siempre que sus decisiones estén sostenidas por evidencia sustancial.

No hay duda, pues, de que las alegaciones de la demanda de *injunction* presentada en la corte inferior aducen hechos constitutivos de causa de acción y que la corte de distrito tiene jurisdicción para conocer del asunto. Siendo ello así, no procede el auto inhibitorio solicitado por los peticionarios, pues además de existir jurisdicción en la corte inferior, el *injunction* preliminar que ésta hubiera podido dictar, en el supuesto de que no existiera tal jurisdicción, sería apelable, siendo entonces de aplicación el artículo 666 del Código de Enjuiciamiento Civil (ed. 1933) dispositivo de que no podrá expedirse ningún auto inhibitorio para impedir cualquier resolución de tribunales inferiores que fuere revisable por medio de apelación.

*Por lo expuesto, procede anular el auto expedido para que continúen los procedimientos en la corte inferior.*

### EN MOCION DE RECONSIDERACION [1]

#### Mayo 10, 1939.

En este caso la demandante presentó una extensa moción en que solicita reconsideremos nuestra sentencia del 12 del mes pasado, por la cual denegamos la expedición definitiva del auto inhibitorio por ella solicitado. La opinión que sirve de base a nuestra sentencia está fundada principalmente en

---

[1] NOTA: Además del Lic. Diego O. Marrero, firma la moción el Lic. O. Coll y Cuchí.

que de acuerdo con las alegaciones de la petición de *injunction* que motivó la solicitud de auto inhibitorio, la Comisión Hípica Insular actuó arbitrariamente y sin conceder una oportunidad de defensa al perjudicado, Manuel C. Rolán, al dictar su resolución de 30 de noviembre de 1938. Hemos estudiado la moción de la demandante y lejos de inclinarnos a rectificar, nos reafirmamos en la posición que asumimos en la sentencia cuya reconsideración se solicita.

Tratando la demandante de distinguir el caso de *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, 227 U.S. 88, que citamos en extenso en nuestra opinión, transcribe algunos párrafos del caso de *Steamboat Canal Co.* v. *Garson*, 185 Pac. 801, 804, 805, resuelto por la Corte Suprema de Nevada. De los párrafos transcritos por la propia demandante, claramente resulta que el citado caso de Nevada sostiene decisivamente nuestra opinión. Después de hacer un ligero resumen del caso de *Louisville & Nashville R. R. Co.*, supra, se dice en un párrafo de la opinión del caso de Nevada que transcribe la demandante:

"En el presente caso la orden de la Comisión no está desprovista de evidencia que la sostenga, ni basó la Comisión su orden en evidencia extraña (*extraneous evidence*), como se pretendía en *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, supra, que podían hacer las juntas administrativas. Como hemos dicho antes, se celebró una amplia audiencia, en la cual todas las partes estuvieron representadas, se enteraron de toda la evidencia sometida y se les dió toda oportunidad razonable de presentar testigos, DE REPREGUNTARLOS, de investigar (*test*), explicar o refutar cualquier evidencia sometida a la consideración de la Comisión." (Moción de reconsideración de la demandante, pág. 32.) Bastardillas nuestras.

No es esa clase de audiencia la que se celebró en el caso de autos. No tuvo el perjudicado Rolán la oportunidad de repreguntar los testigos en su contra, que ni siquiera estuvieron presentes en la llamada audiencia, sino que declararon por *affidavits* ex parte. Si de la petición de *injunction* hubiera aparecido que la Comisión Hípica Insular había concedido a Rolán una audiencia tan amplia como la celebrada en el caso

de Nevada por ella invocado y hubiera resultado además que la evidencia practicada tendía a sostener la resolución impugnada, indudablemente otra hubiera sido nuestra sentencia.

Cita también la demandante el caso de *Traer* v. *State Board of Medical Examiners,* 76 N. W. 833, en que se trataba de la cancelación de una licencia concedida a un médico para el ejercicio de su profesión. La Junta Examinadora de Médicos notificó al Dr. Traer de los cargos contra él presentados, notificándole que debía comparecer y defenderse. Traer compareció a la primera vista por medio de abogado y solicitó su posposición, la cual fué concedida. En la segunda vista que se señaló, no compareció. La Junta, basada en ciertas copias de declaraciones juradas que fueron acompañadas a la querella formulada por cinco médicos del Condado contra el Dr. Traer, le canceló la licencia. No conforme el Dr. Traer con la resolución de la Junta Examinadora, recurrió a los tribunales de justicia y la Corte Suprema de Iowa, al sostener la resolución de la Junta Examinadora, entre otras cosas dijo:

"No se nos escapa el hecho de que las declaraciones originales no constituían evidencia admisible en una corte de justicia que hubieran podido presentarse contra la objeción del demandante, pero constituían evidencia competente para algunos fines y tendían a demostrar que el certificado del demandante había sido revocado. *Aunque de acuerdo con la ley él* (Traer) *tuvo oportunidad de oponerse a que tales declaraciones se usaran en su contra, no lo hizo así.* La Junta no actuó sin evidencia, pues adoptando la posición más favorable al demandante, *actuó a base de evidencia que de haberse objetado hubiera sido excluída."* (Moción de reconsideración de la demandante, págs. 25–26.) Bastardillas nuestras.

En el caso de autos, conforme aparece de la petición de *injunction,* Rolán objetó repetidas veces y en ningún momento renunció el derecho que tenía a que no se presentasen contra él las declaraciones juradas en cuestión. A pesar de su protesta, la Comisión Hípica Insular las admitió. Si la Comisión hubiese seguido la norma señalada por la Corte Suprema de Iowa en el caso citado por ella, al oponerse Rolán no

debió admitir las declaraciones en cuestión y al no admitirlas no hubiese existido evidencia alguna en contra de aquél y en su consecuencia no hubiera dictado la resolución que arbitrariamente dictó.

*Por lo expuesto, procede denegar la reconsideración solicitada.*