HILTON HOTELS INTERNATIONAL, INC., PAUL DE MIKO, haciendo negocios bajo el nombre de HOTEL KASABLANCA, y CENTRAL CARIBBEAN HOTEL ASSOCIATION, INC., recurrentes, *v.* JUNTA DE SALARIO MÍNIMO DE PUERTO RICO, recurrida.

Número 108.

*Sometido:* 3 de marzo de 1953. *Resuelto:* 22 de abril de 1953.

674

*McConnell & Valdés* y *Elmer Toro Lucchetti,* abogados de la recurrente Hilton Hotels International, Inc.; *Córdova & González* y *Hernán Franco,* abogados de los recurrentes De Miko y Central Caribbean Hotel Association, Inc.; *Joaquín Gallart Mendía* y *Domingo Candelario,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

Las recurrentes en este caso han interpuesto ante este Tribunal un recurso de revisión en que impugnan la validez de determinadas partes del Decreto Mandatorio núm. 22, aprobado por la Junta de Salario Mínimo de Puerto Rico el 6 de agosto de 1952, cuyo decreto es aplicable al negocio de hoteles. En su recurso las entidades recurrentes han formulado una multiplicidad de objeciones a la validez de ese decreto.

Como cuestión previa, la Junta recurrida solicita de nosotros que desestimemos el recurso por carecer este Tribunal de jurisdicción sobre el mismo, alegando la Junta que las recurrentes no formularon sus objeciones originalmente ante la Junta y que, por lo tanto, no han agotado sus remedios administrativos en la forma en que lo requiere la Ley de Salario Mínimo de Puerto Rico—Ley núm. 8, aprobada en 5 de

abril de 1941 ((1) pág. 303), según ha sido enmendada posteriormente.

Hemos examinado los autos del caso y nos encontramos con que muchas de las objeciones levantadas ante este Tribunal por las recurrentes habían sido ya debidamente planteadas por ellas ante la Junta, después de haberse publicado un proyecto de decreto y antes de haberse aprobado definitivamente el Decreto núm. 22. El resto de las objeciones no fueron planteadas ante la Junta, y sí ante este Tribunal, pero esas objeciones se refieren a disposiciones nuevas contenidas en el decreto que no formaban parte del proyecto de decreto.

En muchos estatutos que se refieren a actuaciones de agencias administrativas se ha establecido la regla que requiere el que se agoten los remedios administrativos, en alguna forma, como condición previa a la interposición de un recurso de revisión ante un tribunal, y como un requisito esencial para que el tribunal en apelación adquiera jurisdicción. Específicamente se ha dispuesto que no pueden plantearse ante un tribunal objeciones a una actuación administrativa a menos que tales objeciones hayan sido planteadas originalmente ante la agencia concernida. [1] Ahora bien, los requisitos procesales en cuanto al planteamiento administrativo de objeciones forman parte del procedimiento de revisión o apelación ante los tribunales. La forma, manera y método de tramitar una revisión judicial de actuaciones administrativas deben estar gobernados por las disposiciones específicas del estatuto en cuestión. Los trámites procesales en recursos de revisión contra agencias o juntas administrativas se rigen por las leyes especiales que se refieren específicamente a ellas. *Caparra Country Club* v. *Junta Planificación*, 74 D.P.R. 74; *Levers* v. *Anderson*, 326 U.S. 219, referentes a mociones de reconsideración ante una junta; 48 Yale L. J. 935: "Exhaustion of

---

[1] En cuanto a la Ley Federal de Normas Razonables de Trabajo, véase 29 U.S.C.A., sección 210. En relación al "Securities & Exchange Commission", véase 15 U.S.C.A., sección 79x. Sobre actuaciones del Administrador de Precios, véase 50 U.S.C.A. Appendix, sección 924.

Administrative Remedies"; 62 Harv.L.Rev. 1216, 1221. Por lo tanto, la moción de desestimación interpuesta por la Junta debe resolverse de acuerdo con las disposiciones de nuestra Ley de Salario Mínimo. La sección 24 de esa ley, según quedó enmendada por la Ley 48, aprobada en 10 de junio de 1948 ((2) pág. 145), dispone lo siguiente:

"Sección 24.— (Según quedó enmendada por la Ley Núm. 48, aprobada el 10 de junio de 1948).—En todo proceso por violación de cualquiera de las disposiciones de esta Ley, o de un decreto, reglamento, resolución, regla u orden promulgado de acuerdo con esta Ley, se considerará *prima facie* que el salario mínimo, el máximo de horas de labor y las condiciones de trabajo que se hayan fijado en la forma que esta Ley establece son razonables y legales y constituyen el salario de vida, el máximo de horas de labor y las condiciones de trabajo que la propia ley requiere.

"Las conclusiones de hecho a que llegue la Junta, actuando dentro de sus poderes, serán concluyentes, en ausencia de fraude. El perjudicado por cualquier decreto, reglamento, resolución u orden de la Junta podrá, dentro del término de quince días después de la promulgación del decreto mandatorio o de la resolución u orden, solicitar revisión ante el Tribunal Supremo de Puerto Rico. Podrán acumularse en una misma acción varios recursos de revisión cuando las cuestiones levantadas en ellos sean idénticas. El Tribunal podrá confirmar, anular o devolver a la Junta para ulteriores procedimientos el decreto, reglamento, resolución u orden; pero la anulación o devolución sólo tendrá lugar por el fundamento de que la Junta actuó sin facultad o en exceso de sus poderes, siempre que la cuestión se haya levantado ante la Junta de modo expreso y en el momento oportuno de acuerdo con el trámite dispuesto en las secciones 9 y 10 para exponer objeciones y proponer enmiendas en relación con la adopción de decretos, o porque el decreto, reglamento, resolución u orden se obtuvo mediante fraude.

"Establecido el recurso de revisión, si se dicta auto al efecto, será deber de la Junta elevar al Tribunal los autos originales del caso, así como cualquier otro procedimiento habido en el mismo.

"El recurso de revisión producirá la suspensión del decreto, reglamento, resolución u orden impugnada únicamente en cuanto a la parte o partes recurrentes y siempre que lo disponga el tribunal, previa prestación de fianza para garantizar el pago total

de los salarios envueltos en cada recurso o de los daños que se causen, cuando no se trate de salarios, más una cantidad razonable, nunca menor de trescientos (300) dólares, que se impondrá a cada parte promovente contra la cual se dicte sentencia en concepto de honorarios de abogados, a menos que se le haya permitido litigar *in forma pauperis.*"

La transcrita sección 24 dispone que las cuestiones levantadas contra un decreto de salario mínimo deben plantearse de acuerdo con el trámite dispuesto en las secciones 9 y 10 de la misma ley para exponer objeciones y proponer enmiendas en relación con la adopción del decreto. Las secciones 9 y 10 disponen lo siguiente:

"Sección 9.— (Según quedó enmendada por la Ley Núm. 48, aprobada el 10 de junio de 1948).—Tan pronto como la Junta haya adoptado el referido proyecto de decreto se dará a conocer mediante publicación en por lo menos un periódico diario de circulación general en el país y se suministrará copia del mismo a toda persona interesada que la solicite. La publicación incluirá un aviso, que se insertará antes de la copia del proyecto, advirtiendo que éste se ha presentado, que del mismo hay copias disponibles para envío o entrega a los interesados y que, dentro de los quince días siguientes a la fecha que indicará el propio aviso cualquier persona o parte a quien el decreto propuesto pueda perjudicar o afectar adversamente tendrá derecho a formular escrito bajo juramento exponiendo en qué consiste tal perjuicio o interés adverso, estableciendo sus objeciones o proponiendo las enmiendas que considere pertinentes, y expresando los elementos de prueba con que cuenta para sostener sus contenciones.

"Si transcurren los referidos quince días sin haberse recibido en la oficina del Secretario de la Junta ningún escrito en la forma que establece el párrafo anterior, el proyecto se convertirá en decreto mandatorio tal como haya sido publicado y empezará a regir con carácter de ley quince días después de haberse insertado aviso al efecto en un periódico de circulación general en el país, a menos que la Junta disponga un plazo mayor, sin exceder éste de noventa días a partir de la publicación de dicho aviso.

"Sección 10.—(Según quedó enmendada por la Ley Núm. 48, aprobada el 10 de junio de 1948).—Siempre que alguna persona o parte formule el escrito que se menciona en la sección anterior, así como en cualquier otro caso en que la Junta lo juzgue

conveniente, se fijará día y sitio para la celebración de audiencia pública con el objeto de considerar el proyecto de decreto y determinar si el mismo debe aprobarse finalmente para regir y obligar a los patronos, empleados y trabajadores de la industria, negocio u ocupación que se ha investigado. Dicha audiencia, que se celebrará ante la Junta, su Presidente o un receptor de prueba que éste designe, se anunciará mediante aviso que se publicará por lo menos en un periódico de mayor circulación general en el país con antelación no menor de diez días. En dicha audiencia la Junta ofrecerá como prueba todas las estadísticas, estudios, investigaciones, datos, documentos, testimonios y cualesquiera otras informaciones que considere pertinentes, y se oirá a las partes interesadas, recibiéndose toda la prueba pertinente que aporten. Se hará una transcripción taquigráfica del procedimiento.

"La Junta concederá a toda persona que así lo solicite al terminarse la audiencia, un término no menor de diez (10) días para radicar escritos exponiendo objeciones o proponiendo enmiendas al proyecto de decreto a base de la prueba aportada y recibida en esa audiencia.

"Una vez expirado el término para radicar escritos, la Junta procederá a dictar decreto mandatorio para la industria, negocio u ocupación de que se trate, que empezará a regir con fuerza de ley quince (15) días después de haberse insertado aviso al efecto en un periódico de mayor circulación general, a menos que en el aviso se disponga la vigencia para fecha posterior, sin que el plazo así fijado exceda en ningún caso de noventa (90) días a partir de la publicación del aviso."

De acuerdo con tales disposiciones estatutarias un recurrente está obligado, como condición previa a la interposición de un recurso de revisión ante este Tribunal, a exponer sus objeciones o proponer enmiendas al proyecto de decreto después de haberse adoptado y publicado tal proyecto de decreto y antes de haberse dictado el decreto mandatorio definitivo para la industria, negocio u ocupación de que se trate. La ley no exige, como condición previa al recurso de revisión, el que se formulen objeciones y proposiciones de enmienda después de haberse dictado el decreto mandatorio. El propósito es evidente, o sea, el de conceder una oportunidad a la Junta de revisar y corregir cualesquiera defectos del proyecto de de-

creto antes de aprobarse un decreto definitivo. Esa regla encarna una política saludable ya que le concede a la Junta una oportunidad previa de considerar sobre sus méritos las objeciones que se pudiesen formular contra el proyecto de decreto, teniendo en cuenta especialmente la capacidad y los conocimientos especiales de los miembros de la Junta en cuanto a los problemas técnicos que se sometan a su consideración y teniendo en cuenta, además, la conveniencia de lograr una ordenada administración de justicia. *Marshall Field & Co.* v. *Board*, 318 U.S. 253, 256; 48 Yale L.J. 981; Davis, *Administrative Law*, 614, et seq.

Como ya hemos indicado, en cuanto a la mayor parte de las objeciones planteadas ante este Tribunal, las recurrentes cumplieron directamente con las exigencias de las secciones 9, 10 y 24 de la ley y formularon ante la Junta, por escrito, sus objeciones y proposiciones de enmienda, incluyendo su impugnación a la constitucionalidad de algunas partes del decreto, después de haberse publicado el proyecto de decreto y antes de aprobarse definitivamente el decreto mandatorio. Es cierto que el resto de las objeciones no fueron planteadas ante la Junta, pero, como también ya hemos indicado, estas últimas objeciones no pudieron haber sido planteadas de acuerdo con la ley, ya que esas objeciones se referían a cuestiones nuevas que no estaban contenidas en el proyecto de decreto y que fueron incorporadas, por vía de adición, al decreto mandatorio. La ley no exige el que se levanten objeciones y se propongan enmiendas después de haberse aprobado el decreto mandatorio. De establecerse tal requisito, ello equivaldría a una moción de reconsideración. En aquellos casos en que el estatuto exige específicamente la presentación de una moción de reconsideración, como condición previa a una revisión judicial, la ausencia de tal moción sería fatal al recurso e implicaría falta de jurisdicción de parte del tribunal. *A. Roig, Sucrs.* v. *Junta Salario Mínimo*, 67 D.P.R. 582; Parker, *Administrative Law*, pág. 254, et seq.; Davis, *Administrative Law*, pág. 638. Sin embargo, si la ley no exige el que se pre-

sente una moción de reconsideración, el hecho de no radicarse tal moción ante la agencia concernida no destruye la jurisdicción del tribunal en apelación. Nuestra ley actual de salario mínimo no contiene tal requisito.([2]) *Levers* v. *Anderson*, supra. En ausencia de una disposición expresa en nuestra Ley de Salario Mínimo en cuanto a la necesidad de una moción de reconsideración, las recurrentes no venían obligadas a formular objeciones ante la Junta de Salario Mínimo después de haberse aprobado el decreto mandatorio.([3]) Por lo tanto, debe declararse sin lugar la moción de desestimación de la Junta. Pasaremos ahora a considerar las objeciones planteadas por las recurrentes ante este Tribunal.

■■ En su alegato las recurrentes señalan distintos errores, que equivalen a objeciones formuladas contra el Decreto núm. 22. Consideraremos conjuntamente los dos primeros errores señalados. Ellos son los siguientes:

Que la evidencia en la cual la recurrida basó su determinación con relación a las necesidades básicas de los empleados de hoteles es totalmente insuficiente y no sostiene las determinaciones de la Junta a ese respecto.

Que la Junta no hizo determinación de hecho alguna ni tampoco existía evidencia alguna en que basar una determi-

---

([2]) Es interesante observar que nuestra Ley de Salario Mínimo anteriormente requería que se presentase una moción de reconsideración como condición previa para que cualquier resolución de la Junta tuviese carácter de final y pudiese ser revisada por este Tribunal, de acuerdo con el apartado D de la sección 24. *A. Roig, Sucrs.* v. *Junta Salario Mínimo*, supra. Pero la Ley núm. 451, aprobada el 14 de mayo de 1947((1) pág. 951), al enmendar de nuevo la sección 24 eliminó el trámite de reconsideración. *A. Roig, Sucrs.* v. *Junta Salario Mínimo*, supra, Nota 1. Ello enfatiza más aún la intención legislativa de que no se requiera una moción de reconsideración como requisito previo a un recurso de revisión.

([3]) Incidentalmente, y por vía de analogía, en el caso de *Labor Board* v. *Jones & Laughlin Co.*, 331 U. S. 416, 427, la Corte Suprema de los Estados Unidos resolvió que en cuanto a cuestiones que surjan después de haberse dictado una orden por la Junta Nacional de Relaciones Obreras, un apelante no tiene necesidad de plantear objeciones ante la Junta en cuanto a tales cuestiones.

nación de que las condiciones de labor en la industria son perjudiciales a la conservación de las normas de vida necesarias para su salud, eficiencia y bienestar general.

Estas dos objeciones se refieren a la alegada ausencia o insuficiencia de conclusiones de hechos (*findings*) y de prueba en cuanto a las necesidades básicas, y las condiciones de labor en la industria de los empleados de hoteles. La sección 1 (*d*) de la ley lee así:

"Se declara, además, que es la política de esta Ley asegurar el progresivo desenvolvimiento de la agricultura y de las industrias y negocios que operan en Puerto Rico, procurando garantizarles condiciones favorables a su estabilidad económica y a su natural expansión, y que a tal efecto el organismo creado para dar cumplimiento a los propósitos de esta Ley fijará salarios tomando en consideración los costes, la situación financiera de las industrias y ramas de la producción, las fluctuaciones del mercado, y las condiciones especiales existentes en cada localidad, así como las condiciones de vida y de trabajo de los obreros."

La sección 3 de la Ley de Salario Mínimo dispone, en parte, lo siguiente:

"Sección 3.—(Según quedó enmendada por la Ley Núm. 48, aprobada el 10 de junio de 1948). Será deber de la Junta estudiar los salarios, horas de labor y condiciones de trabajo que prevalecen en las distintas ocupaciones, negocios o industrias, y hacer investigaciones en cuanto a las condiciones de vida de los obreros, así como en cuanto a los costes y la situación financiera de las empresas, industrias y ramas de la producción."

De acuerdo con la sección 6, como condición previa al inicio de los procedimientos encaminados a la aprobación de un decreto, la Junta debe determinar que en cualquier industria, negocio u ocupación los salarios que se pagan son insuficientes para satisfacer las necesidades normales de los trabajadores o que la jornada de labor y las condiciones de trabajo son perjudiciales a la conservación de las normas razonables de vida necesarias para su salud, eficiencia y bienestar general. Bajo la sección 12, al estatuir el salario mínimo, la Junta deberá tomar en consideración el coste de vida y las necesidades de

los trabajadores y deberá fijar el salario mínimo más alto que razonablemente pueda pagar la industria, negocio u ocupación de que se trate siempre que no conlleve una reducción apreciable de empleos.

De las disposiciones citadas surge la necesidad de que la Junta llegue a alguna determinación o conclusión en cuanto a las necesidades y condiciones de vida y de trabajo de los trabajadores. La ley no dispone taxativamente que en el Decreto en sí se enumeren expresamente determinadas conclusiones especiales. Independientemente de la cuestión técnica relativa a si la ausencia de tal requisito estatutario implica que la validez del decreto no pueda ser impugnada por tal motivo (Cf. *Cal. Drive-In Restaurant Ass'n.* v. *Clark*, 22 Cal 2d 287, 147 A.L.R. 1028; *Pacific States Co.* v. *White*, 296 U.S. 176, 186), el decreto impugnado en el caso de autos contiene determinaciones adecuadas en cuanto a las necesidades de los trabajadores. A los fines de que este Tribunal pueda cumplir responsablemente su función judicial de revisión, es altamente saludable y conveniente que tales conclusiones se hagan constar en el propio decreto. *Securities Comm'n* v. *Chenery Corp.*, 332 U.S. 194; *Panama Refining Co.* v. *Ryan*, 293 U.S. 388; *Opp Cotton Mills* v. *Administrator*, 312 U.S. 126; *United States* v. *Carolina Carriers Corp.*, 315 U.S. 475; 34 Cornell L. Rev. 473, 492: "Administrative Findings"; *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U.S. 499, en donde el Juez Cardozo dice: "Tenemos que conocer cuál es la decisión antes de poder resolver si está correcta o equivocada." De todos modos, el decreto contiene tales determinaciones en forma legalmente suficiente. Se inicia el decreto con el siguiente pronunciamiento:

1. Determinación de Insuficiencia de Salarios.

La Junta de Salario Mínimo consideró en su sesión extraordinaria del 19 de diciembre de 1951 varias estadísticas que habían sido recopiladas sobre las condiciones de trabajo y de vida de los empleados del negocio de hoteles. Después de analizadas dichas estadísticas a la luz del presupuesto mínimo ade-

cuado de gastos de una familia obrera del tamaño promedio de la de tales empleados, se determinó que los salarios que se pagan en el negocio de hoteles son insuficientes para satisfacer las necesidades normales de los empleados que trabajan en el referido negocio."

Además, en las páginas 12 a 19 del decreto se enumeran en detalle, con números y estadísticas, las condiciones de vida y de trabajo de tales obreros.

Las determinaciones de la Junta en cuanto al aspecto en discusión fueron legalmente suficientes. Sus conclusiones no tenían que ser específicas, formales ni separadamente enumeradas, no siendo aplicable la Regla 52 de Enjuiciamiento Civil, y tales conclusiones podían tener la forma de declaraciones generales, especialmente si del decreto surgían el pensamiento, la intención y la actuación de la Junta. *Johnston Seed Co.* v. *United States*, 191 F.2d 228; *State of New York* v. *United States*, 98 F.Supp. 855 (1951) ; *Baltimore & O. R. Co.* v. *United States*, 100 F.Supp. 1002 (1951) ; *Riss & Co.* v. *United States*, 100 F.Supp. 468; *Florida* v. *United States*, 282 U.S. 194. Lo importante es que las determinaciones se refieran a los hechos básicos, sin que la Junta tenga que "anotar" cada conclusión con la evidencia específica presentada. *United States* v. *Pierce Auto Lines*, 327 U.S. 515; Davis, *Administrative Law*, pág. 531.

Consideremos si las conclusiones de hecho a que llegó la Junta en cuanto a las condiciones de vida y de trabajo de los obreros y empleados están sostenidas por la prueba presentada ante tal entidad. La sección 24 de la Ley de Salario Mínimo dispone que "las conclusiones de hecho a que llegue la Junta, actuando dentro de sus poderes, serán concluyentes, en ausencia de fraude", y que "el Tribunal podrá confirmar, anular o devolver a la Junta para ulteriores procedimientos el decreto, reglamento, resolución u orden; pero la anulación o devolución sólo tendrá lugar por el fundamento de que la Junta actuó sin facultad o en exceso de sus poderes." Este Tribunal ha asumido, sin discusión, que tales disposicio-

nes implican que la Junta haya tenido ante sí, prueba sustancial. *Luce & Co.,* v. *Junta Salario Mínimo,* 62 D.P.R. 452, 474; *Hospital San José* v. *Junta Salario Mínimo,* 63 D.P.R. 747. En *Sunland Biscuit Co.* v. *Junta Salario Mínimo,* 68 D.P.R. 371, se resuelve que, en ausencia de fraude, las conclusiones de hecho a que llegue la Junta de Salario Mínimo deben considerarse como finales por esta Corte.

Antes de considerar la alegación de las recurrentes al efecto de que la determinación de la Junta objeto de discusión no está sostenida por la prueba, conviene formular un breve resumen del estado de la jurisprudencia en torno a la finalidad de un pronunciamiento administrativo y en cuanto a la extensión del poder judicial de revisión en tal caso. Naturalmente, las doctrinas jurisprudenciales dependen del estatuto específico envuelto en cada caso y, generalmente, no estamos obligados por el criterio de otros tribunales, aunque siempre es saludable el que estemos percatados de la reacción mental de otros jueces ante problemas similares al que nos ocupa. Ahora bien, hasta hace pocos años los estatutos federales relativos a reglamentaciones administrativas disponían que eran concluyentes las determinaciones sobre los hechos de juntas y agencias administrativas si estaban sostenidas por evidencia sustancial. Aun si se omitía la palabra "sustancial", las cortes añadían judicialmente ese concepto. Davis, *Administrative Law,* 869; *Labor Board* v. *Columbian Co.,* 306 U.S 292; *Edison Co.* v. *Labor Board,* 305 U.S. 197. Tal como se expresa en la notable opinión del Juez Frankfurter en el caso de *Universal Camera Corp.* v. *Labor Board,* 340 U.S. 474, 487, los tribunales, bajo esa regla anterior, tenían la tendencia a no examinar la totalidad de la prueba presentada ante una Junta, y se limitaban a considerar la prueba presentada por la parte favorecida por el fallo de la Junta, y si ella era *prima facie* suficiente, se sostenía la validez del fallo. Se aprobó entonces una nueva ley federal de Relaciones Obreras (Taft-Hartley) y se aprobó la Ley de Procedimiento Administrativo, y en ambas se disponía que el dictamen administrativo

debía estar sostenido por evidencia sustancial, pero que al formular su decisión, el tribunal en apelación debería revisar la totalidad del récord, o de la prueba. Tal como se indica en el caso citado de *Universal Camera Corp.*, bajo tal legislación debe escudriñarse toda la prueba presentada, a los fines de comprobar si existe evidencia realmente contradictoria o si hay un verdadero conflicto en la prueba. Para determinar si la evidencia es sustancial, se hace preciso, bajo los estatutos mencionados, y de acuerdo con la opinión citada, el considerar otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada, incluyendo aquella que sea contraria al punto de vista de la Junta y hasta el punto de que se demuestre claramente que la decisión de la Junta no está justificada por una evaluación justa del peso de la prueba. *Universal Camera Corp.* v. *Labor Board*, supra, pág. 488, 490. Sin embargo, la propia Corte Suprema de los Estados Unidos, en el caso que estamos citando, indica que lo que hizo el Congreso fué expresar legislativamente una actitud mental o disposición de ánimo (*mood*) al efecto de que los tribunales debían asumir la responsabilidad de examinar toda la prueba. El Congreso no estableció una norma rígida, ni quiso destruir la eficacia de la función primaria de las juntas, como agencias con un bagaje de experiencia y de conocimientos especializados. Lo que se pretendió fué evitar que los jueces abdicasen su función judicial y se convirtiesen en autómatas obligados a respetar ciegamente las determinaciones de una Junta, pero no se pretendió que los tribunales sustituyesen su criterio por el criterio experto de una junta. De acuerdo con el propio caso de *Universal Camera Corp.*, si ante una Junta surgen dos puntos de vista, o distintas inferencias de los hechos que estén razonablemente en conflicto, el tribunal debe examinar el récord para comprobar si realmente existe tal conflicto razonable pero, de haberlo, el tribunal debe respetar el punto de

vista y la inferencia formulada por la Junta, aun si el tribunal hubiese preferido la otra inferencia si la cuestión se hubiese dilucidado *de novo* ante el tribunal. En síntesis, la opinión en el caso de *Universal Camera Corporation* equivale a una admonición a las cortes para que examinen todo el récord, pero no introduce una innovación trascendental en cuanto a las doctrinas de revisión de fallos administrativos. Davis, ob. cit., pág. 925, y véase el excelente artículo sobre el caso en discusión, por el Profesor Jaffe, en 64 Harv. L. Rev. 1233: "Judicial Review: Substantial Evidence on the Whole Record". Aun bajo los estatutos ya mencionados, quedan en pie las siguientes doctrinas: (1) que una evidencia sustancial es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión, *Edison Co.* v. *Labor Board,* supra; (2) que de existir un conflicto razonable y auténtico en la prueba, el tribunal debe considerar como concluyente la determinación de la Junta, *Capital Transit Co.* v. *United States,* 97 F.Supp. 614; *Consolidated Royal Chem. Corp.* v. *Federal Trade Com'n,* 191 F.2d 896; (3) debe respetarse el dictamen de una junta en cuanto a la credibilidad de los testigos, *Steelco Stainless Steel* v. *Federal Trade Commission,* 187 F.2d 693; *Hundell* v. *O'Hearne,* 99 F.Supp. 954; (4) es concluyente una determinación de la Junta que tenga una base racional, *Miss. Valley Barge Co.* v. *United States,* 292 U.S. 282; *National Labor Rel. Bd.* v. *Tri-State Casualty Ins. Co.,* 188 F.2d 50; *Capital Transit Co.* v. *United States,* supra.

Hemos asumido la responsabilidad de examinar la totalidad de la prueba presentada ante la Junta. En cuanto a las condiciones de trabajo y de vida de los trabajadores, tal como se hace constar en el propio decreto, la Junta basó sus determinaciones en varias estadísticas que habían sido recopiladas por su División de Investigaciones y Estadísticas, cuyas estadísticas fueron admitidas en evidencia. Tales estadísticas eran admisibles y podían servir de base a las determinaciones de la Junta. *Opp. Cotton Mills* v. *Administrator,*

supra, págs. 154, 155. Sin embargo, las recurrentes formulan las siguientes objeciones a esas estadísticas:

(1) Que fué en diciembre de 1951 que la Junta hizo una determinación en cuanto a la insuficiencia de los salarios, en vista de las condiciones de vida y trabajo de los trabajadores, iniciando entonces el proceso de preparación y aprobación del decreto, y que en esa fecha algunas estadísticas fueron presentadas informalmente a la Junta, y no fué hasta marzo de 1952 que se presentó formalmente el estudio de la División de Investigaciones y Estadísticas de la Junta. El 3 de abril de 1952 se aprobó el proyecto de decreto. Surge por lo tanto que antes de aprobarse el proyecto de decreto ya la Junta tenía en su poder un estudio estadístico adecuado sobre los extremos ya mencionados. Además, en la vista celebrada posteriormente ante la Junta se presentaron en evidencia las estadísticas completas y ellas fueron consideradas por la Junta a los fines de la aprobación del decreto. Tuvieron las recurren tes la oportunidad de presentar prueba contraria a lo expuesto en las estadísticas.

(2) Que el estudio se verificó a base de 483 familias, a pesar de que los peritos tenían en su poder nóminas de 1122 familias.

(3) Que la determinación se hizo erróneamente a base de miembros de una familia, en lugar de dependientes, sin tomar en consideración cualesquiera otros ingresos de los demás miembros trabajadores de la familia. La Junta consideró que existía un promedio de 4.3 miembros por familia de cada empleado y las recurrentes presentaron prueba tendente a demostrar que sus empleados tienen un promedio de 3.3 dependientes. Asumiendo la validez de los promedios ofrecidos por las recurrentes, al añadirse el empleado en sí a los 3.3 dependientes, surge una coincidencia sustancial en los promedios usados por la Junta y por las recurrentes.

(4) Que de las estadísticas usadas por la Junta se excluyeron aquellos empleados que ganaban un salario más alto de

ochenta centavos por hora. No se ha demostrado ante nos que, de haberse incluído a esos empleados, se hubiesen aumentado los promedios en forma tan sustancial que convirtiese en arbitraria la determinación de la Junta, teniendo en cuenta, especialmente que el 65.4 por ciento de los empleados de los llamados "hoteles grandes" de San Juan ganaban menos de cincuenta centavos por hora.

(5) Que el período de tiempo cubierto por las estadísticas se refería a meses que no eran típicos, ya que, en esos meses, el movimiento de pasajeros en los hoteles era menor que en otros meses, teniendo en cuenta especialmente que las recurrentes presentaron prueba en cuanto a las condiciones de vida y de trabajo en meses de mayor movimiento. Naturalmente, la prueba ante la Junta debe guardar una similitud razonable con la situación a ser investigada por la agencia, y el período de tiempo estudiado no debe ser muy remoto a la fecha de la aprobación del decreto. Pero no se nos ha demostrado que la Junta haya actuado arbitraria o irrazonablemente al basar su dictamen en la situación prevaleciente en el período de tiempo seleccionado.

En resumen, desde el punto de vista de lo dispuesto en la sección 24 de la Ley de Salario Mínimo, las determinaciones de la Junta en cuanto a las condiciones de vida y de trabajo de los empleados no están viciadas de fraude, y la Junta no actuó "sin facultad o en exceso de sus poderes". Tales conclusiones se basaron en evidencia sustancial, suficiente ante una mente razonable para sostener las conclusiones. La totalidad de la prueba no desvirtúa el peso de la prueba que sirvió de base a la Junta. La resolución del conflicto en la prueba es concluyente y la Junta tuvo una base racional para su fallo. Por lo tanto, no se cometieron los dos primeros errores señalados.[4]

---

[4] Incidentalmente, sobre la necesidad y contenido de conclusiones expresas administrativas, véase la anotación en 146 A.L.R. 209.

■ El tercer error señalado por las recurrentes es el siguiente:

"Que la recurrente Hilton Hotels International, Inc., alega que la Junta recurrida cometió error al establecer una clasificación para hoteles que tienen, bien operado por el mismo patrono o por patronos distintos, casinos o salas de juegos de azar, por los siguientes motivos:

"(1) Que la Ley de Salario Mínimo no contiene autorización para dicha clasificación, y que dicha clasificación está en violación de las disposiciones de la sección 12 de la Ley.

"(2) Que dicha clasificación, si la misma fuese autorizada por la Ley, sería arbitraria, irrazonable y discriminatoria, y privaría a las recurrentes mencionadas en este párrafo de su propiedad sin el debido procedimiento de ley, en contravención de las disposiciones de la Sección 7 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, y además privaría a dichas recurrentes de la protección igual de las leyes, en contravención de las disposiciones de la misma Sección de la Constitución.

"(3) Que la clasificación mencionada, aunque aparece como una clasificación a base de la operación de un casino o sala de juegos de azar, es en realidad basada en la supuesta capacidad económica individual para pagar salarios más altos, lo cual está en contravención de lo dispuesto en la sección 12 de la Ley de Salario Mínimo, habiendo sido rechazada tal base por este Honorable Tribunal en el caso de *American Railroad Company of Puerto Rico* v. *Junta de Salario Mínimo*, 68 D.P.R. 796.

"(4) Que la Junta no tuvo ante sí evidencia que justifique la separación en una clasificación aparte de los hoteles que operan Casinos bien por el mismo patrono o por patronos distintos.

"(5) En el supuesto de que el estatuto se interprete como autorización a clasificar al Caribe Hilton Hotel, Condado Beach Hotel, y Jack's Club, en una clasificación diferente de todos los otros hoteles de Puerto Rico, y la cual fija a dichas recurrentes el pago de jornales más altos que cualquier otro hotel en Puerto Rico, dicha ley está en contravención de las disposiciones constitucionales fundamentales, en que la Legislatura ha delegado sus poderes indebidamente a la Junta recurrida e indebidamente ha dejado de proveer normas para que la Junta recurrida pueda actuar."

La Junta estableció dos categorías, una, con salarios más altos, que cubre a los hoteles que tienen casinos o salas de juegos de azar, operados por el dueño del hotel o por patronos distintos dentro del hotel, y la otra, con salarios más bajos, con respecto a los demás hoteles.

La primera alegación de las recurrentes en cuanto a este error señalado es al efecto de que en la propia Ley de Salario Mínimo no se autoriza a la Junta a formular tal clasificación. No tienen razón las recurrentes. La sección 12 de la Ley dispone, en parte, lo siguiente:

"Sección 12.—(Según quedó enmendada por la Ley Núm. 48, aprobada el 10 de junio de 1948).—Al estatuir el salario mínimo, la Junta deberá tomar en consideración el coste de vida y las necesidades de los trabajadores y deberá fijar el salario mínimo más alto que razonablemente pueda pagar la industria, negocio u ocupación de que se trate siempre que no conlleve una reducción apreciable de los empleos.

"La Junta podrá definir cualquier industria, negocio u ocupación en la forma que crea más conveniente para hacer efectiva la reglamentación de salarios, horas de labor y condiciones de trabajo.

"Se podrá clasificar los trabajos en cualquier industria, negocio u ocupación, de acuerdo con la naturaleza de los servicios a prestar, así como prescribir escalas de salarios mínimos apropiados para distintas clases de trabajo, con el objeto de fijar para cada clasificación el tipo más alto de salario mínimo compatible con los propósitos de esta Ley. Se podrá señalar también salarios mínimos diferentes para distintas zonas o regiones, o para distintas categorías o clases de la misma industria, negocio u ocupación, cuando a su juicio tal diferenciación sea aconsejable debido a las condiciones existentes entre las zonas, regiones o categorías de la misma industria, negocio u ocupación, siempre que tal acción no conceda ventaja de competencia a otra u otras zonas, regiones o categorías de la misma industria, negocio u ocupación; pero al disponerse el salario mínimo para una industria, negocio u ocupación el tipo fijado será uniforme para toda clase, categoría, zona o región de la industria, negocio u ocupación de que se trate."

Tal articulado autoriza a la Junta a establecer clasificaciones de pagos de salarios para distintas categorías o clases

de la misma industria, "cuando a su juicio tal diferenciación sea aconsejable debido a las condiciones existentes entre . . . las categorías de la misma industria." De la totalidad de la ley surge un pronunciamiento legislativo en cuanto a cuáles deben ser esas "condiciones existentes", como, por ejemplo, la situación financiera y económica de las unidades dentro de cada categoría (*Escudero* v. *Junta Salario Mínimo*, 66 D.P.R. 594), incluyendo el volumen de producción, el movimiento del negocio, los costes de producción, los ingresos, las oportunidades y facilidades para el desenvolvimiento del negocio (*Sunland Biscuit Co.* v. *Junta Salario Mínimo*, supra), las condiciones de transportación y mercadeo, los salarios pagados a los obreros y la situación económica en general de los trabajadores. La sección 1 (*d*) declara que es la política de la ley, en parte, el que la Junta fije salarios tomando en consideración los costos, la situación financiera de las industrias y ramas de la producción, las fluctuaciones del mercado, las condiciones especiales existentes en cada localidad, así como las condiciones de vida y de trabajo de los obreros. Lo mismo se indica en la sección 3. De la propia sección 12 surgen limitaciones al poder de la Junta, al efecto de que (1) la industria pueda razonablemente pagar el salario fijado, (2) el salario fijado no conlleve una reducción apreciable de los empleos y que (3) la acción de la Junta al establecer determinada clasificación o diferenciación no conceda ventaja de competencia a otra u otras categorías de la misma industria o negocio.

La ley autoriza a la Junta a establecer categorías distintas dentro de la industria o negocio de hoteles. Pero objetan las recurrentes que tal autorización legislativa implica una indebida delegación de poderes, no conteniendo la ley normas adecuadas que le sirvan de guía a la Junta. Ya este Tribunal ha sostenido la validez de la Ley de Salario Mínimo en cuanto ella establece una delegación de poderes a la Junta de Salario Mínimo. *Luce & Co.* v. *Junta Salario Mínimo*, supra. Tal como surge de esa opinión, el mundo mo-

derno se caracteriza por la gran complejidad en las relaciones sociales y económicas de las personas, conjuntamente con la progresiva supervisión gubernativa sobre la conducta individual, y ello implica que la legislatura está imposibilitada de anticipar legislativamente, en forma detallada, minuciosa o específica, la multiplicidad de situaciones que puedan surgir de esas relaciones complejas, siendo suficiente el que la ley en cuestión señale o establezca normas amplias y generales que sirvan de guía o dirección a entidades administrativas expertas, para que éstas, con su experiencia y conocimientos especiales, apliquen esas normas concretamente a los hechos que puedan surgir y ultimen los detalles que implementen la política general legislativa. Véanse, además, los casos de *Pueblo* v. *Rivera*, 67 D.P.R. 190, 192 y *Sifre* v. *Pellón, Juez*, 54 D.P.R. 587, 600. Tales normas no necesitan expresarse con precisión o exactitud matemática y pueden ser tan generales que justifiquen más de una conclusión y, a menos que la norma no se exprese o sea tan sumamente vaga que como cuestión de hecho no exista, la presunción de constitucionalidad que conlleva toda ley basta para sostener su validez. *Pueblo* v. *Martínez*, 62 D.P.R. 734. En el caso de autos las normas señaladas en la Ley de Salario Mínimo, que ya hemos mencionado, son legalmente suficientes, y no dan lugar a una indebida delegación de poderes legislativos. ([5])

Alegan las recurrentes que, aún asumiendo la existencia y validez de las normas, y de la delegación de poderes, la Junta no ejercitó adecuadamente esos poderes ya que, según se expone, la clasificación que hizo la Junta es arbitraria y no está sostenida por la prueba. Veamos. La propia Junta, en el decreto, explicó la diferenciación establecida entre hoteles que tenían, o no tenían, casinos y salas de juegos de azar, en la forma siguiente:

([5]) Las doctrinas que hemos establecido en cuanto a delegación de poderes fueron ratificadas recientemente por la Corte Suprema de los Estados Unidos en el caso de *Carlson* v. *Landon*, 342 U.S. 524, resuelto el 10 de marzo de 1952.

"Ninguna clasificación, desde luego, puede ser arbitraria. Es preciso que, atendiendo al propósito de la Ley, los componentes de cada clase tengan características comunes entre sí que los diferencien sustancialmente de los demás.

"Puede decirse, en términos muy generales, que los hoteles en Puerto Rico se dividen en comerciales y de turismo por la clase de clientela que los patrocinan. No quiere esto decir que la clientela de la industria esté dividida en dos compartimientos herméticamente cerrados, sin que un comerciante que venga de la isla a San Juan no pueda hospedarse en el Caribe Hilton o un turista que venga de Nueva York no pueda hospedarse en el Capitol o el Palace. Existe, como es natural, cierta elasticidad en el patrocinio que uno y otro tipo de clientela hace de unos hoteles y otros. Es innegable, sin embargo, que los dos tipos de clientela gravitan hacia sus respectivos centros, estableciendo dos órbitas en el negocio claramente distinguibles, aunque ambas se entrelacen en el apogeo del ciclo turístico.

"Tres hoteles (Caribe-Hilton, Condado Beach y Normandie) de los cinco comprendidos en la clasificación "A" del proyecto de decreto objetaron dicha clasificación. No la objetaron ni el Jack's ni el Escambrón, que son los otros dos hoteles que estaban incluídos en esa misma clasificación.

"Dos factores principales se tomaron en cuenta para la agrupación de esos hoteles en una clase: (1) que los salarios que pagan son comparables entre sí y superiores a los que pagan los demás hoteles; y (2) que se benefician mayormente del mercado turístico.

"El Hotel Normandie, que no tiene casino ni club nocturno, quedaba comprendido dentro de la clasificación por tener más de 125 habitaciones. Creemos que no existe la necesaria relación lógica entre el número de habitaciones, tomado como factor único de diferenciación, y el hecho de que un hotel sea comercial o de turismo. Es enteramente claro que un hotel puede pertenecer a una u otra clase independientemente del número de sus habitaciones.

"Lo mismo es cierto, también como factor único de diferenciación, en cuanto a que un hotel tenga o no club nocturno. Si bien un club nocturno es una instrumentalidad turística, su mera existencia no le da a un hotel suficiente fuerza de competencia en el mercado de turistas frente a otros hoteles con facilidades adicionales, especialmente casino o sala de juegos de azar."

"La 'Ley de Juegos de Azar' ha establecido de por sí una clase en la industria hotelera. La clase existiría aun cuando la

ley fuera meramente de carácter fiscal, limitándose a autorizar la operación de salas de juego mediante el pago de ciertos derechos. La ley, sin embargo, va todavía más lejos en la diferenciación de los hoteles con casino en una categoría aparte. Según hemos visto, dicha ley y el mencionado reglamento de la Junta Consultiva de Turismo hacen imperativo, como condición indispensable para que se otorgue una franquicia de juego (en lo que es relevante a nuestra conclusión), que el hotel—'el establecimiento como parte del cual vaya a operar la sala de juego'—sea turístico por definición y mantenido 'al nivel de los debidos "standards" internacionales reconocidos' para 'las facilidades turísticas que sean requeridas por la Junta'.

"El diferencial que existe entre los salarios que pagan los hoteles con casino y los salarios que pagan los demás hoteles hace necesaria la clasificación de los hoteles con casino en una categoría separada para dar cumplimiento al propósito de la Ley (sección 12, supra). De otro modo, se privaría de todo aumento visible en sus salarios al 55 por ciento de los empleados de la industria que trabajan en los 3 hoteles que tienen casino y se estaría aprobando en verdad un decreto para solamente los hoteles con menos capacidad económica.

"Hemos concluído (véase la sección sobre Efectos del Decreto Mandatorio, infra) que 32 centavos por hora es el salario mínimo más alto que puede fijarse a los hoteles comerciales de la Capital. A continuación ofrecemos el efecto que tiene ese mínimo sobre la nómina para 1951 de dichos hoteles comerciales y el que tendría sobre la nómina para el mismo año de los hoteles con casino, los cuales también están localizados en la Capital:

Hoteles comerciales de la Capital

% de empleados que reciben aumento............ 68. 4

% de aumento en la nómina sujeta a reglamentación 16. 7

Hoteles con casino

% de empleados que recibirían aumento.......... 14. 0

% de aumento que tendría la nómina sujeta a reglamentación.............................. 0. 7

"Las cifras comparables para el Condado Beach, cuyos salarios son inferiores a los del otro hotel con casino que objetó el proyecto de decreto, y para el Normandie, que es un hotel marginal entre ambos grupos, son las siguientes:

Normandie

% de empleados que reciben aumento. . . . . . . . . . . 59. 8

% de aumento en la nómina sujeta a reglamentación 6. 9

Condado Beach

% de empleados que recibirían aumento. . . . . . . . . 29. 3

% de aumento que tendría la nómina sujeta a regla-
mentación. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1. 0

"Por otro lado, los hoteles con casino, especialmente el Caribe Hilton y el Condado Beach, son los que mayormente se benefician del mercado turístico, sin que con ellos pueda competir económicamente en ese mercado ninguno de los otros hoteles. El Normandie, que no tiene casino ni otras atracciones especiales para turistas, se beneficia en forma rezagada o marginalmente de dicho mercado, aunque más que el resto de los hoteles que no tienen casino. Según aparece de la prueba del Hotel Palace (uno de los hoteles comerciales de la Capital), el Caribe Hilton y el Condado Beach le han restado parte de su clientela local, lo que tiende a indicar que aún en el mercado propio de los hoteles comerciales los hoteles con casino y otras atracciones turísticas tienen más fuerza de competencia que los demás hoteles de la Capital.

"Concluímos, por lo tanto, que la clasificación de los hoteles con casino o salón de juegos de azar en una categoría separada es razonable y necesaria para que el 55 por ciento de los empleados de la industria hotelera que trabajan en dichos hoteles reciban el beneficio del salario mínimo más alto posible que pueda pagar esa división de la industria sin que tal clasificación conceda a otras clases ventaja de competencia.

"Como hemos visto, la 'Ley de Juegos de Azar' es el factor externo (a la Ley de Salario Mínimo) en que principalmente se sustenta la clasificación de los hoteles con casino. Es lógico, consiguientemente, que demos gran peso a la zonificación que bajo dicha ley se hizo a la isla 'en orden de su importancia y desarrollo comercial y turístico' por reglamento de la Administración de Fomento Económico. Si bien la única prueba que a este respecto tenemos consiste de los estimados de operación de un hotel que todavía se está construyendo en Barranquitas, la misma indica que las zonas establecidas por la Administración de Fomento Económico son también a nuestros fines razonables

y están justificadas. El Hotel Barranquitas, que no competirá con los hoteles de la Capital que tienen casino y otras atracciones turísticas, no podría razonablemente soportar salarios mínimos más altos que los que le han sido fijados.

"En resumen, hemos aprobado dos clasificaciones, cada una subdividida en tres zonas. Una clasificación la constituyen los 'hoteles que tienen, bien operado por el mismo patrono o por patrono distinto, casino o sala de juegos de azar'; y la otra, 'todos los demás hoteles'. La primera clasificación está subdividida en las mismas tres zonas que se han establecido por reglamento de la Administración de Fomento Económico para el pago de los derechos de franquicia de juego. Las tres zonas en que se subdivide la segunda clasificación son las mismas que se disponían en el proyecto de decreto, las cuales no fueron objetadas.

"Conviene señalar por último, para mayor aclaración, que la clasificación de los hoteles con casino o sala de juegos de azar es aplicable tanto a los hoteles en que el casino esté en el mismo establecimiento, aunque el hotel y el casino sean operados por patronos distintos, como al patrono que opera él mismo el casino conjuntamente o en relación con el hotel, aunque la sala de juego y las facilidades de alojamiento estén en dos establecimientos distintos."

Esencialmente, la Junta siguió tres factores para establecer tal clasificación, a saber:

(1) Que los hoteles con casino tenían mayor movimiento económico y atraían más turistas, clientes e invitados.

(2) Que, como cuestión de hecho, los hoteles con casinos, antes del decreto, pagaban salarios más altos a sus empleados que los incluídos en la segunda categoría.

(3) Que la clasificación fijada no concedía ventajas de competencia a otra categoría del mismo negocio.

Hemos examinado el récord de la vista celebrada ante la Junta y cada una de esas conclusiones está sostenida por la prueba. Las recurrentes insisten en que el verdadero motivo de la Junta al determinar la clasificación fué el de que los hoteles con casino tenían más ingresos que los otros, y que la prueba no sostiene tal proposición. Del propio decreto surgen cuáles fueron los factores considerados por la Junta, y no se le puede atribuir a la Junta otros móviles que los ex-

puestos en el decreto. Tal criterio queda robustecido por el hecho de que en el decreto se coloca en la primera categoría a los hoteles con casino, aun si el casino es operado por una persona o entidad distinta a la propietaria del hotel. O sea, los ingresos mayores del dueño del hotel por el hecho de tener casino no constituyen el factor de mayor relevancia, sino que, aun si el propietario del hotel no obtiene ingresos del casino porque otra persona opera el casino, el hotel en sí tiene un mayor movimiento económico debido al hecho en sí de que hay un casino en el hotel.

Debemos observar que aun si este Tribunal considerase que la Junta podía haber considerado factores distintos, si la Junta siguió otros factores autorizados por la ley y basados en la prueba, el ejercicio de tal criterio por la Junta no implica que ella haya actuado "sin facultad o en exceso de sus poderes", bajo la sección 24 de la ley, debiendo nosotros, por lo tanto, respetar su criterio. En *American Power Co.* v. *S. E. C.*, 329 U.S. 90, 105, 112, 118, se resuelve que es suficiente una delegación de poderes basada en normas amplias y generales en cuanto a actuaciones administrativas, en vista de las necesidades de una legislación moderna que se enfrente con complejos problemas económicos y sociales y que cuando el poder legislativo le ha confiado a una agencia administrativa la responsabilidad de seleccionar los medios para llevar a efecto una política estatutaria, la selección de determinadas alternativas o factores por la Junta no debe ser dejada sin efecto, ya que la relación del remedio utilizado con la política general del estatuto es peculiarmente una cuestión de competencia administrativa. Se indica lo siguiente en la opinión:

"En vista de que hubo una base racional para la selección hecha por la Comisión, el hecho de que otras soluciones pudieron haberse seleccionado es irrelevante. La Comisión es la entidad que tiene el deber estatutario de considerar las posibles soluciones y seleccionar aquélla que considere más apropiada para llevar a cabo la política general de la ley. Nuestra revisión se limita exclusivamente a comprobar si el remedio es adecuado desde el

punto de vista de la Constitución y del estatuto. Estaríamos invadiendo el campo de la discreción de la Comisión si considerásemos las distintas alternativas con la esperanza de encontrar una que nosotros consideremos más apropiada. En vista de que el remedio seleccionado por la Comisión en este caso se puede sostener bajo la ley y bajo los hechos considerados por la Comisión, no es importante el que la 'American and Electric' crean que debían haberse dictado otras órdenes alternativas."

En síntesis, los factores utilizados por la Junta en este caso no son contrarios a la ley y a la prueba presentada, y el hecho de que pudo haber otros factores no invalida el decreto.

El caso de *Opp Cotton Mills* v. *Administrator*, supra, envolvía la ley federal de Normas Razonables de Trabajo, y se impugnó una clasificación dentro de una industria, hecha por el Administrador de Salarios. Se resuelve lo siguiente:

(1) Los factores señalados en la ley en cuanto a clasificaciones no son tan indefinidos que impliquen una delegación inconstitucional de poderes, cuando la ley dispone que los salarios se fijarán con debida consideración de condiciones económicas y competitivas y serán tales que no reduzcan sustancialmente el empleo en la industria, y al disponer que en la clasificación de una industria las agencias administrativas decidirán en primer término que la clasificación propuesta no le concederá una ventaja competitiva a ningún grupo y que los salarios no reducirán sustancialmente las oportunidades de empleo.

(2) Las agencias administrativas tienen la facultad de considerar cualesquiera de los factores señalados en la ley, sin que la ley determine el peso que deba darse a cualquiera de esos factores, siempre y cuando que no haya lugar a la ventaja competitiva o reducción sustancial en los empleos, que ya hemos mencionado.

(3) El Administrador debe considerar, entre otros factores relevantes, las condiciones de competencia, según sean afectadas por los gastos de producción, transportación y vida, y el administrador puede considerar además el nivel de sala-

rios existentes, según se ha establecido o mantenido voluntariamente por el patrono.

(4) El Congreso ha aceptado previamente el criterio administrativo en cuanto al peso que ha de dársele a esos factores.

(5) La clasificación hecha por el Administrador está sostenida por evidencia sustancial. Las objeciones se dirigen en este caso (*Opp Cotton Mills*) al peso de la evidencia que sostiene las conclusiones o al testimonio de ciertos testigos o a la evidencia en conflicto. La clasificación hecha por el Administrador debe ser sostenida por la Corte. Cualquier otro resultado implicaría que la corte estaría sustituyendo su criterio en cuanto al peso de la prueba y las inferencias que se puedan deducir de ella, por el criterio del Administrador, lo cual está prohibido por el estatuto.

El caso de *Columbus & G. Ry. Co.* v. *Adm'r of Wage and Hour Div.*, 126 F.2d 136, también se refiere a una clasificación dentro de una industria hecha por el Administrador de la División de Horas y Salarios, bajo la ley federal de Normas Razonables de Trabajo. La clasificación diferenciaba entre la división de líneas troncales (*trunk-line*) de los ferrocarriles y su división de líneas cortas (*short line*). Se resuelve que no es función del tribunal el determinar si la clasificación hecha era la mejor posible, o si debían considerarse otros factores. Se indica que la intervención judicial debe limitarse a una determinación de si existe base racional para formular un criterio en cuanto a si las oportunidades de empleo han sido reducidas sustancialmente por la clasificación, o si ella implica el establecimiento de ventajas competitivas. Se resuelve que aun si un patrono específico pierde dinero como resultado de los salarios fijados, la determinación de salarios es válida si la industria en general no pierde dinero. (En cuanto a este último punto, véase, al mismo efecto, *American R. R. Co.* v. *Junta Salario Mínimo*, 68 D.P.R. 796, 803, en donde se dice que cuando se fijan salarios mínimos para una

industria, ello se hace tomando en consideración la industria en general y no el estado económico de determinada empresa en particular.)

La Junta formuló una determinación, basada en prueba presentada, al efecto de que, como cuestión de hecho, los patronos en la primera categoría pagaban voluntariamente salarios más altos. Ese era un factor relevante tendente a justificar la clasificación. *Opp Cotton Mills* v. *Administrator*, supra. En *Escudero* v. *Junta Salario Mínimo,* 66 D.P.R. 594, 598, se dice lo siguiente:

"La mejor contestación para esta contención se encuentra en la resolución de la Junta declarando sin lugar la moción de reconsideración, que dispone en parte como sigue: 'La prueba demuestra que en la zona primera podrían pagarse los salarios en cantidad un poco más alta que en la zona segunda, donde son menores las oportunidades de mercado, buen precio de venta, acceso a la materia prima y facilidades de transporte. En la zona primera, según la realidad probada, se han venido pagando salarios más altos que en la otra. La clasificación es, por todo ello, razonable. Véase el caso de *Luce & Company* v. *Junta de Salario Mínimo,* 62 D.P.R. 452, 458, nota 3.' "

También hubo base en la prueba para la conclusión de que la clasificación señalada no reducía sustancialmente las oportunidades de empleo, ni concedía ventajas competitivas a otros grupos dentro de la industria o negocio. En *United States* v. *Pierce Auto Lines*, supra, a las páginas 535, 536, la Corte Suprema de los Estados Unidos resuelve que el criterio de una Junta en cuanto a condiciones de competencia, que tenga una base racional en la prueba no debe ser dejado sin efecto por un tribunal. En el caso reciente de *Swift & Co.* v. *United States*, 343 U.S. 373 (mayo de 1952), la Corte Suprema nacional resolvió que decisiones de la Comisión de Comercio Interestatal en cuanto a materias que requieren consideración pericial y criterio administrativo, incluyendo cuestiones relativas a la existencia de ventajas competitivas, no deben ser dejadas sin efecto por los tribunales, si la Comisión le dió peso a factores relevantes. Véase, además, el caso más reciente

aún de *Fed. Trade Comm'n* v. *Ruberoid Co.*, 343 U.S. 470. Ya la misma corte había indicado, a través del ex-Juez Presidente Stone, que un tribunal cumple con su deber judicial al concluir que la agencia administrativa ha actuado dentro de los límites y fronteras de su autoridad estatutaria, y que su selección entre distintas alternativas posibles, que se adapten a los propósitos legislativos, es una que una persona racional pudiera haber hecho. *Security Adm'r* v. *Quaker Oats Co.*, 318 U.S. 218.

Hemos discutido ciertas doctrinas básicas del Derecho Administrativo, cuyo desarrollo ha motivado agudas controversias que responden a la diferencia entre dos actitudes en cuanto a una filosofía de gobierno. De un lado, la tesis de aquellos que, respondiendo a las exigencias de la civilización moderna, pretenden conceder una autonomía casi absoluta a las agencias administrativas, y de otro lado, la de aquellos que desean subordinar tales agencias al criterio judicial, bajo reglas de ley, con el propósito de asegurar la continuación de un gobierno de leyes, y no de hombres. Realmente, no se le debe imprimir un énfasis excesivo a la virtualidad, exclusiva, según algunos, de los conocimientos periciales de los administradores. Existen muchas áreas en que los tribunales pueden considerar, adecuadamente, cuestiones de carácter administrativo. Tampoco sería conveniente el trasplantar a nuestro peculiar ambiente, en forma artificial, doctrinas sobre derecho administrativo que responden a una realidad industrial, posiblemente distinta a la nuestra. Pero el juzgador no tiene una oportunidad muy amplia de hacer valer sus predilecciones personales cuando el legislador ha hablado en forma específica. La toga judicial no debe destruir la personalidad intelectual del juez, pero sí conlleva el deber de observar los estatutos.(⁶) Ya nuestra Asamblea Legislativa ha creído necesario y conveniente, ante los problemas espe-

---

(⁶) Véase la declaración de abstención del Juez Frankfurter en *Public Utilities Comm'n* v. *Pollack*, 343 U.S. 451, 466.

ciales de nuestro pueblo, el crear un gran número de agencias administrativas y el concederle amplias facultades en cuanto a cuestiones sobre los hechos. La propia Ley de Salario Mínimo establece, como hemos visto, que las conclusiones de la Junta en cuanto a los hechos serán concluyentes, en ausencia de fraude o de actuaciones en exceso de las facultades y poderes de la Junta. Una interpretación literal rigurosa de tal disposición podría convertir a este Tribunal en un eco de la Junta. Pero aun exigiendo que las conclusiones se basen en evidencia sustancial, según ya la hemos definido, la consideración de determinados factores por la Junta, en cuanto a los extremos ya discutidos, tienen una base racional, en la prueba y en el estatuto. Por tal razón es que creemos que no se han cometido los tres primeros errores señalados.

 Los tres próximos errores señalados por las recurrentes son los siguientes:

"La recurrente Hilton Hotels International, Inc., alega que la Junta recurrida cometió un error al fijar un salario mínimo de 36¢ por hora para los empleados de dichos recurrentes, que regularmente y en el curso ordinario de su trabajo reciben propinas de los huéspedes, porque

"(1) Dicha porción del Decreto Mandatorio número 22 no encuentra apoyo en ninguna determinación de hechos.

"(2) Dicha porción de dicho Decreto Mandatorio número 22 es contraria a la evidencia ante la Junta.

"(3) Dicha determinación de la Junta recurrida viola las disposiciones de la sección 12 de la Ley en el sentido de que dicha determinación no toma en consideración las necesidades de los trabajadores afectados.

"Que aquella parte de la clasificación objetada en este párrafo que fija un salario de 40¢ para los empleados no comprendidos dentro de la primera clasificación de la zona primera, no está basada en una determinación de que las recurrentes están en una situación financiera que les permita pagar el salario fijado.

"Que la Junta recurrida cometió error al imponer una condición exigiendo a los patronos clasificados en el Grupo A del Artículo IV del Decreto Mandatorio, que en el caso de los ayudantes de mozos y en el de las camareras deberá el patrono evidenciar

bajo la firma del empleado o en alguna otra forma fehaciente, que el empleado ha recibido semanalmente la suma de $1.60 en propinas, porque

"(1) Dicha condición no encuentra apoyo en ninguna evidencia ante la Junta, y (2) dicha condición impone al patrono obligaciones y deberes imposibles de cumplir."

El Decreto 22 determina que, en cuanto a hoteles que tienen casino o sala de juegos de azar, recibirán un salario mínimo de 36 centavos por hora, los "siguientes empleados que regularmente en el curso de su trabajo reciban propinas de los huéspedes: Mozos (*waiters*), Ayudantes de Mozos (*bus-boys*), dependientes de bar (*bar-tenders*), Camareras (*maids*) y Botones (*bell-boys*). Los demás empleados recibirán 40 centavos por hora. También se dispone que "en el caso de los ayudantes de mozo y en el de las camareras deberá el patrono evidenciar bajo la firma del empleado o en alguna otra forma fehaciente que éste ha recibido semanalmente por lo menos $1.60 en propinas, en cuyo defecto el empleado tendrá derecho a recibir la diferencia hasta el salario mínimo fijado para la clasificación (*b*) de la zona correspondiente." (7)

En las Conclusiones de Hecho se indica lo siguiente por la Junta, en cuanto a propinas:

"C—Propinas.

"Es de conocimiento general que los clientes de los hoteles acostumbran dar propinas a los empleados que directamente les sirven. Esto ocurre casi invariablemente con los mozos cuando el cliente paga la cuenta. De la propina recibida por los mozos se benefician también sus ayudantes (*bus-boys*), de acuerdo con la prueba aportada por el Condado Beach y el Caribe Hilton. La costumbre de dar propinas se repite en la barra con los dependientes. Reciben asimismo propinas los botones; y la prueba indica que también las camareras, por lo menos en los hoteles grandes de la Capital.

---

(7) En cuanto a los hoteles con casino en Ponce, Mayagüez y Arecibo el decreto fija 31 centavos por hora para los empleados mencionados que reciben propinas y 35 centavos para los demás empleados, y en cuanto a las demás ciudades y pueblos, 28 centavos por hora para los empleados, con propinas, y 32 centavos para los demás.

"La cantidad que unos empleados y otros reciben por concepto de propinas no ha podido ser determinada con razonable certeza. Sin embargo, la prueba del Caribe Hilton y del Condado Beach nos convence de que la cantidad recibida en propinas por los mencionados empleados es relativamente sustancial, con la posible excepción de las camareras . . . . . . . .

"Esta otra objeción patronal al proyecto de decreto va aparentemente dirigida a conseguir una disminución en el aumento total que puedan conllevar los salarios mínimos. Consideramos que la aprobación de un diferencial entre el salario mínimo de los empleados que reciben propinas y el salario mínimo de los que no reciben propinas no debe tener ese resultado.

"Tal diferencial se justifica únicamente como una disposición obrera para proveer un ingreso mínimo más alto para aquellos empleados que no disfrutan del ingreso adicional que otros tienen por concepto de propinas. De esta manera, el diferencial por propinas puede servir el propósito legítimo de dar más en salario a los empleados más necesitados a expensas de los menos necesitados, pero sin que de ello obtengan ventaja indebida las empresas hoteleras. O lo que es lo mismo: con diferencial o sin él, la industria hotelera debe pagar tanto más en salarios como su situación financiera lo permita.

"De los estados de la Unión que tienen en vigor decretos de salario mínimo para los empleados de hoteles y restaurantes, ocho (y el Distrito de Columbia) han seguido la norma de fijar un diferencial en el salario mínimo a favor de los empleados que no reciben propinas. Otros siete estados y el Estado Libre Asociado de Puerto Rico no han seguido dicha norma, habiendo fijado salarios mínimos sin diferencial alguno entre unos empleados y otros. No hay, pues, unanimidad de criterio, sino una división bastante pareja, sobre el principio que debe prevalecer en relación con el punto que ahora discutimos.

"La posición que favorece el diferencial, visto como una medida obrera, no puede ser lógicamente desvirtuada en teoría. Debe ser por las dificultades en la aplicación práctica del diferencial—siempre envuelto por limitaciones de idioma en lenguaje impreciso—que su uso no se ha generalizado, habiéndose adherido la mitad de las jurisdicciones a la razón de conveniencia práctica en vez de a la razón teórica. (Ningún decreto es mejor—tanto para patronos y empleados como para los funcionarios que deben velar por su cumplimiento—que uno de fácil aplicación). A esa última posición repetimos nuestra adhesión, como

norma general. Es con renuencia que habremos de apartarnos de ella si median razones poderosas.

"Según hemos señalado anteriormente, la prueba del Caribe Hilton y del Condado Beach nos ha convencido de que los mozos y sus ayudantes, los dependientes de la barra, los botones y las camareras de dichos hoteles reciben en propinas, con la posible excepción de las camareras, cantidades relativamente sustanciales en el curso regular de su trabajo. Esa prueba justifica que variemos, en cuanto a la clasificación de hoteles con casino, nuestra norma de no establecer el discutido diferencial. Al variarla para estos hoteles, hemos adoptado el mismo diferencial de 4 centavos propuesto por el Condado Beach, el cual consideramos razonable. El cambio en la norma, sin embargo, no ha disminuído el aumento total en salarios que entendemos que pueden pagar dichos hoteles.

"De acuerdo con lo que se dispone en el Artículo IV del decreto que hemos aprobado, la clasificación se limita a todos los dichos empleados que 'regularmente en el curso de su trabajo reciban propinas de los huéspedes'; y se agregó: *'Disponiéndose* que en el caso de los ayudantes de mozo y en el de las camareras deberá el patrono evidenciar bajo la firma del empleado o en alguna otra forma fehaciente que éste ha recibido semanalmente por lo menos $1.60 en propinas, en cuyo defecto el empleado tendrá derecho a recibir la diferencia hasta el salario mínimo fijado para [los demás empleados] de la zona correspondiente'.

"Se incluyó en ese Disponiéndose a los ayudantes de mozo porque estos empleados no reciben las propinas directamente del huésped, sino una participación que les dan los mozos de las propinas recibidas por ellos. Fueron incluídas también las camareras en el Disponiéndose por considerar que ocupan una posición marginal en el grupo de empleados que reciben propinas. En esto se tomó en consideración tanto la cantidad inferior que aparentemente reciben en propinas como el hecho de que el servicio que prestan a los huéspedes no está inmediatamente conectado con el pago de una cuenta, como ocurre con los mozos y los dependientes de la barra, ni es tan inmediatamente personal como en el caso de los botones. De no haber incluído a las camareras en el Disponiéndose, las hubiéramos excluído de la clasificación de empleados que reciben propinas. Su inclusión en el Disponiéndose es una medida conciliatoria en medio de las dudas que tenían los miembros de la Junta sobre su inclusión o exclusión de dicha clasificación.

"Se llegó a la cantidad de $1.60 que se requiere que por lo menos reciban en propinas los ayudantes de mozos y las camareras multiplicando los 4 centavos de diferencial por 40 horas, 8 horas menos que la semana regular de trabajo. Consideramos que es una cantidad razonable."

La sección 12 de la Ley de Salario Mínimo dispone, en parte, que la Junta "podrá clasificar los trabajos en cualquier industria, negocio u ocupación, de acuerdo con la naturaleza de los servicios a prestar, así como prescribir escalas de salarios mínimos apropiados para distintas clases de trabajo, con el objeto de fijar para cada clasificación el tipo de salario mínimo compatible con los propósitos de esta ley."

Lo que hizo la Junta fué establecer una clasificación ocupacional, en cuanto a propinas, al efecto de que los empleados que recibiesen propinas ganasen cuatro centavos menos, por hora, que aquellos que no recibiesen propinas. Ello equivale, implícitamente, a una disposición al efecto de que las propinas se considerarán como parte del salario mínimo. La clasificación entre los empleados estaba justificada por las disposiciones de la ya citada sección 12, y tal clasificación no es arbitraria, estando sostenida por la prueba presentada ante la Junta. La Junta tuvo una base racional para esa clasificación y actuó correctamente dentro de los poderes delegados a ella.

En términos generales, ya este Tribunal ha resuelto que una clasificación hecha por la Junta entre obreros diestros y semidiestros es válida. *American R. R. Co.* v. *Junta Salario Mínimo*, supra. Es válida una clasificación entre empleados si ella tiene una base razonable y si existe una relación racional entre el propósito perseguido y la clasificación hecha. 31 Am. Jur. 1038, 1039. Específicamente se ha resuelto que una clasificación hecha a base de propinas no és discriminatoria ni inválida, en vista de que ella puede ir encaminada a corregir males contrarios a la política legislativa. *Cal. Drive-In Restaurant Assn.* v. *Clark*, supra; 147 A.L.R. 1028, 1036. En el caso de *Williams* v. *Jacksonville Terminal Co.*, 315 U.S.

386, la Corte Suprema de los Estados Unidos resolvió que, bajo la ley federal de Normas Razonables de Trabajo, una disposición administrativa al efecto de que las propinas pueden ser consideradas como parte del salario mínimo es constitucionalmente válida y no es discriminatoria. En la opinión se indica que no fué la intención de la ley el eliminar la práctica de propinas, ni fué la intención legislativa el concederle una preferencia a aquellos empleados que reciban propinas sobre aquellos empleados que no presten servicios directos. Se dice además en la opinión que tal disposición tiende a evitar ingresos irregulares y aumenta la seguridad en el disfrute de salarios, y que "la deseabilidad de considerar las propinas al establecer un sistema de salarios mínimos, esto es, si desde el punto de vista del bienestar social, las propinas deben ser consideradas como parte del salario, no es materia que está sujeta a decisión judicial," sino que cae dentro de la competencia administrativa. Las propinas pueden ser consideradas como parte de los salarios. *Moyd* v. *Atlantic Greyhound Corp.*, 170 F.2d 302; *Harrison* v. *Kansas City Terminal Ry. Co.*, 36 F. Supp. 434, confirmado en 126 F.2d 421, 422; *Ryan* v. *Denver Union Terminal Ry. Co.*, 126 F.2d 782. Véanse además las notas en 40 Col. L. Rev. 1262 y 147 A.L.R. 1039. En el caso de California de *Cal. Drive-In Restaurant Assn.* v. *Clark*, supra, la Corte Suprema de California llegó hasta el punto de resolver, en cuanto a salarios de empleados de restaurantes, que es válida una prohibición al patrono al efecto de que no incluya las propinas como parte del salario mínimo.

Alega la recurrente Hilton Hotels International, Inc., que impugna la validez de la clasificación en discusión porque no está sostenida por determinación alguna de hecho ni por la prueba. Lo que hemos citado del decreto indica que hubo una conclusión adecuada sobre los hechos. Hemos examinado el récord de la vista y existe evidencia sustancial que justifica tal conclusión. Alega la misma recurrente que dicha determinación no toma en consideración las necesidades de los trabajadores afectados. Independientemente de la capacidad

que la recurrente pueda tener, o no tener, para plantear el efecto del decreto en cuanto a los empleados, no se nos ha demostrado que la clasificación hecha perjudique a los empleados desde el punto de vista de sus necesidades. Además, la Junta pudo haber seguido otros factores señalados en la ley, como el de "fijar el salario mínimo más alto que razonablemente pueda pagar la industria . . . siempre que no conlleve una reducción apreciable de los empleos," y aun si tal salario mínimo sea en exceso de las necesidades mínimas de los trabajadores.

En cuanto a la fijación de cuarenta centavos por hora como mínimo para los empleados que no reciban propinas, hubo una determinación adecuada al efecto de que las recurrentes están en una situación financiera que les permite pagar el salario fijado. Tal determinación no ha sido controvertida por las recurrentes.

██ Se impugna la disposición en el decreto relativa a que en el caso de los ayudantes de mozos y en el de las camareras deberá el patrono evidenciar, bajo la firma del empleado o en alguna otra forma fehaciente que el empleado ha recibido semanalmente la suma de $1.60. Se alega que sería muy difícil e improbable que tales empleados cumplan legítimamente tal disposición. Tal alegación no es suficiente para implicar la nulidad de esa parte del decreto. Se trata de un método adoptado administrativamente, cuya sabiduría no cae dentro del ámbito de la competencia o revisión judicial, ya que no implica ausencia de poderes o facultades de la Junta, y cuya efectividad aún no se ha comprobado en la práctica.

██ ██ El séptimo error señalado por las recurrentes lee así:

"Que la Junta recurrida cometió error al aprobar el Artículo V del Decreto Mandatorio Número 22, por los motivos siguientes:

"(1) En tanto en cuanto el artículo V (A) del Decreto Mandatorio Número 22 obliga al patrono a pagar a un empleado que trabaje más de 20 horas a la semana, pero menos de 32, un salario semanal no menor que el que resulte multiplicando el tipo por hora regular que esté percibiendo por 32, dicha disposición

del Decreto Mandatorio Número 22 viola los derechos de las recurrentes de acuerdo con las disposiciones de la Sección 7 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, privando a las recurrentes de su propiedad sin el debido procedimiento de ley, y privando a las recurrentes de la protección igual de la ley, en el sentido de que las recurrentes estarán por dicha disposición obligadas a pagar por trabajo no realizado o por el cual dichas recurrentes no han contratado.

"(2) Que el requisito de pagar a tiempo y medio a todo empleado que trabaje 20 horas o menos a la semana es arbitrario, irrazonable y discriminatorio por las mismas razones apuntadas en el párrafo anterior y viola las disposiciones constitucionales ya citadas."

Sobre el particular la Junta, en su decreto, dispuso lo siguiente:

"Artículo V.—Garantía de Compensación Semanal Mínima.

"A—Todo empleado que trabaje más de veinte (20) horas a la semana, pero menos de treintidós (32) a pesar de estar disponible para trabajar, tendrá derecho, salvo en casos de fuerza mayor, a un salario semanal no menor que el que resulte multiplicando el tipo por hora regular que esté percibiendo por treintidós (32). Se considerará que el empleado no está disponible para trabajar a los fines de este apartado únicamente cuando no se personare al trabajo, se negare a trabajar o estuviere enfermo en forma tal que le impida realizar sus labores habituales.

"B—Todo empleado que trabaje veinte (20) horas o menos a la semana tendrá derecho a un salario semanal no menor que el que resulte multiplicando las horas de labor por una y media (1½) vez el tipo por hora regular que esté percibiendo."

El efecto de tal disposición es, en parte, el de establecer una garantía de un salario mínimo semanal, aun si el empleado no ha trabajado la totalidad de las horas regulares durante la semana. Por ejemplo, a un empleado que ha trabajado durante la semana solamente 25 horas se le pagaría un salario mínimo semanal computado sobre la base de si él hubiese trabajado 32 horas durante la semana. Las recurrentes, en síntesis, alegan lo siguiente:

(1) Que tal plan de salario mínimo garantizado no está autorizado por la Ley de Salario Mínimo.

(2) Que tal plan no está sostenido por la prueba que desfiló ante la Junta.

(3) Que esa disposición es inconstitucional porque priva a las recurrentes de su propiedad sin un debido proceso de ley, ya que las obliga a pagar salarios por períodos de tiempo en que tales empleados no han rendido labor o servicios algunos a sus patronos, o sea, les obliga a pagar compensación sin el *quid pro-quo* de servicios a cambio de esa compensación, o sea, de acuerdo con el ejemplo que hemos presentado, a aquellos empleados que han trabajado solamente 25 horas a la semana se les pagaría, adicionalmente, por las siete horas en que ellos no han trabajado para el patrono.

(4) Que tal disposición es inconstitucional por ser discriminatoria y arbitraria.

El decreto contiene las siguientes conclusiones de la Junta sobre esta materia:

"Por el Artículo V del proyecto de decreto se concedía a los empleados una garantía semanal mínima de la paga correspondiente a 44 horas de labor cuando hubieren trabajado semanalmente menos de dichas 44 horas pero más de 20. Esta disposición hubiera imposibilitado el plan de economía que los hoteles Caribe Hilton y Condado Beach ponen en práctica durante los meses que quedan fuera de la temporada turística, en los cuales se reduce a alrededor de 36 horas el horario regular de trabajo a la semana en vez de reducir parte del personal. La Junta considera que ese plan es conveniente tanto a patronos como a trabajadores y que no hay razón alguna para desalentarlo y sí para hacerlo más viable en vista de que tiende a distribuir las oportunidades de empleo durante el período de menos actividad económica de los hoteles de turismo. Consistentemente con este criterio, se redujo la garantía a 32 horas, la cual consideramos razonable por equivaler a 4 días regulares de trabajo."

Con respecto a la alegación de que la ley no autoriza tal plan de salario mínimo garantizado, debemos observar que: (*a*) la sección 1 de la ley determina que la política de la ley es, en parte, la de lograr el establecimiento de normas mínimas de vida que sean necesarias para la salud, eficiencia y el bienes-

tar general de los trabajadores en las distintas ocupaciones, sin reducir los empleos sustancialmente o la facultad para ganar la vida, al igual que proteger a los trabajadores en sus medios y en su nivel de vida; (*b*) la sección 3 dispone que será deber de la Junta estudiar los salarios, horas de labor y condiciones de trabajo y hacer investigaciones en cuanto a las condiciones de vida de los obreros; (*c*) la sección 6 autoriza el inicio de procedimientos encaminados a la aprobación de un decreto cuando la Junta determine que los salarios en cualquier negocio o industria son insuficientes para satisfacer las necesidades normales de los trabajadores o que la jornada de labor y las condiciones de trabajo son perjudiciales a la conservación de las normas razonables de vida necesarias para su salud, eficiencia y bienestar general; (*d*) la sección 8 autoriza a la Junta a determinar los salarios, horas de labor y condiciones de trabajo que deban establecerse, o sea, el tipo mínimo de salario por períodos regulares o extraordinarios de labor, o por ambos, que deberá pagárseles, el máximo de horas a trabajar por día, semana o período mayor y las condiciones de trabajo requeridas para la conservación de su salud, seguridad y bienestar; (*e*) la sección 12 determina que al estatuir el salario mínimo, la Junta deberá tomar en consideración el coste de vida y las necesidades de los trabajadores y deberá fijar el salario mínimo más alto que razonablemente pueda pagar la industria o negocio, siempre que no conlleve una reducción apreciable de los empleos.

Surge paladinamente de las disposiciones citadas que el propósito esencial de la ley es el de atender a las necesidades mínimas de vida de los trabajadores a la luz de la situación económica de la industria. La ley no se refiere al valor de los servicios de los obreros, ni hace depender el salario mínimo a pagar a los trabajadores en el valor de sus servicios, sino en sus necesidades de vida. La compensación no es función de valor de servicios pero sí es función de coste de vida de los trabajadores, de acuerdo con la ley. La disposición específica en controversia no equivale a la fijación de horas mínimas

de trabajo, como alegan las recurrentes al decir que la ley sólo autoriza la fijación de horas máximas. Mas bien representa ser una fijación de un salario mínimo semanal garantizado. Nada de lo contenido en la ley exige que el salario se fije por horas, o a base de horas actualmente trabajadas, pero sí la ley autoriza la fijación de salarios mínimos semanales, como se ha hecho en este caso. En vista de todo lo expuesto, llegamos a la conclusión de que la Junta actuó dentro de sus facultades estatutarias.

 Un problema distinto surge de la alegación de que la actuación de la Junta es inconstitucional, en tanto obliga a los patronos a pagar salarios por servicios no prestados. Conviene formular un breve estudio del desarrollo de la jurisprudencia en cuanto a este particular. En *Adkins* v. *Children's Hospital*, 261 U.S. 525, la Corte Suprema de los Estados Unidos declaró nula e inconstitucional una ley del Distrito de Columbia que fijaba salarios a base de las necesidades o del coste de vida de obreras, indicándose que los salarios fijados no tenían relación con el valor de los servicios de las trabajadoras. Lo mismo se declaró en *Morehead* v. *N. Y. Ex Rel Tipaldo*, 298 U.S. 587. Sin embargo, como es de conocimiento general, en el caso posterior de *West Coast Hotel Co.* v. *Parrish*, 300 U.S. 379, la Corte Suprema nacional revocó expresamente los casos de *Adkins* y *Morehead* y declaró válido un estatuto del Estado de Washington que disponía la fijación de salarios a base del coste de vida (*living wage*), sin incluir factor alguno en cuanto al valor de los servicios. Véase, además, *United States* v. *Darby*, 312 U.S. 100, 125, en cuanto a la validez constitucional de la ley federal de Normas Razonables de Trabajo.

A estas alturas, en nuestro clima social, no podemos ignorar el paso de avance logrado a través de las opiniones citadas de la Corte Suprema de los Estados Unidos. Es innecesario el exponer de nuevo los argumentos en cuanto a la validez de una legislación que encarna un sentido tan profundo de humanidad y de justicia social. Esa ya es una controversia re-

suelta a través de soluciones aceptadas por la comunidad. Basta decir que los salarios de obreros pueden ser fijados a tono con las necesidades básicas de vida, y hasta de mera ·existencia, de los trabajadores, independientemente del valor en el mercado de sus servicios, siempre y cuando tales salarios no menoscaben arbitrariamente la situación económica de la industria. Del récord no surge, y no se ha demostrado, que la totalidad de los salarios fijados, incluyendo los que estamos discutiendo bajo el séptimo error señalado, sean confiscatorios o impliquen un perjuicio sustancial y arbitrario con respecto a la estructura económica de la industria o negocio de hoteles. La única alegación es al efecto de que los salarios garantizados no guardan relación con el valor de los servicios, y ya hemos dictaminado sobre esa contención.

Precisamente en el caso de *Mary Lincoln Candies* v. *Department of Labor*, 289 N.Y. 262, 45 N.E.2d 434, 143 A.L.R. 1078, se resolvió por la Corte de Apelaciones del Estado de Nueva York que una disposición del Departamento del Trabajo fijando salarios mínimos semanales garantizados en forma prácticamente idéntica a la disposición del Decreto 22 que estamos discutiendo, es constitucional y válida ya que los salarios pueden fijarse a base del coste o necesidades de vida de los obreros, aun si tal plan equivale al pago de salarios por servicios no prestados, y ya que la propia ley de salario mínimo de Nueva York no requiere que los salarios se fijen a base de servicios prestados.[8] El exigir que los salarios se basen en el valor de los servicios puede implicar la anulación del propósito legislativo de lograr salarios que sean suficientes para mantener un nivel adecuado de vida.

---

[9] El caso citado de *Mary Lincoln Candies* fué resuelto con una votación de cuatro a tres, de los jueces que componen la Corte de Apelaciones de Nueva York. Véase la excelente discusión sobre este caso en 12 Fordham L. Rev. 252: "Guaranteed Wages Under New York State Minimum Wage Legislation", en donde se solidariza el autor con la opinión de la mayoría y se formula una crítica efectiva y detallada de la opinión de la minoría. Véanse, además, 43 Col. L. Rev. 137 y 29 Cornell L. Q. 263.

De otro lado, el plan adoptado no significa que el efecto de tal disposición sea el de reducir sustancialmente los empleos, y tal consecuencia no se ha demostrado en el caso de autos.

El salario garantizado equivale a una modificación estatutaria de la libertad de contratación entre el obrero y el patrono. La utilidad social de tal modificación conlleva su validez. Véase 43 Col. L. Rev. 643, en cuanto a la tendencia moderna a reglamentar contratos entre obreros y patronos. El patrono no está obligado a emplear a nadie, pero una vez él utilice a empleados, él debe estar sujeto a una intervención razonable del Estado que tienda a proteger a los obreros.

En el caso reciente de *Day-Brite Lighting, Inc.* v. *Missouri*, 342 U.S. 421, de marzo de 1952, la Corte Suprema de los Estados Unidos sostuvo la validez de un estatuto que penalizaba a patronos que deduzcan salarios de obreros durante ciertas horas en días de elecciones políticas. Se alegaba que ello implicaba la necesidad de pagar por servicios no prestados y menoscababa la libertad de contratación. Se dijo lo siguiente, en la opinión del Juez Douglas:

"El argumento de libertad de contratación nos recuerda la filosofía de *Lochner* v. *New York*, 198 U.S. 45, que invalidó una ley de Nueva York de horas máximas de trabajo en panaderías; *Coppage* v. *Kansas*, 236 U.S. 1, que anuló un estatuto de Kansas que prohibía cierta clase de contratos (*yellow dog contracts*); *Adkins* v. *Children's Hospital*, 261 U.S. 525, que declaró inconstitucional un estatuto federal que fijaba salarios mínimos para mujeres en el Distrito de Columbia, y otros casos de esa vendimia. Nuestras decisiones recientes hacen claro que nosotros no somos una super legislatura para pesar la sabiduría de determinada legislación y para decir que la política pública expresada en la ley ofende el bienestar general. El poder legislativo está sujeto a ciertas limitaciones, como se resuelve en *Tot* v. *United States*, 319 U.S. 463. Pero las legislaturas estaduales tienen autoridad constitucional para experimentar con nuevas técnicas; tienen derecho a sus propias normas en cuanto al bienestar general y ellas pueden, dentro de extremadamente amplios límites, controlar prácticas en el campo de las relaciones obrero-patronales, siempre y cuando que no queden violadas prohibiciones

constitucionales específicas, y hasta el punto de que se eviten conflictos con leyes federales válidas y. aplicables. Esa es la esencia de *West Coast Hotel Co.* v. *Parrish*, 300 U.S. 379; *Nebbia* v. *New York*, 291 U.S. 502; *Olsen* v. *Nebraska*, 313 U.S. 236; *Lincoln Union* v. *Northwestern Co.*, 335 U.S. 525 y *California Auto Ass'n* v. *Maloney*, 341 U.S. 105.

" . . . . . . . . . . .

"La única apariencia de sustancia en la objeción constitucional a la ley de Missouri es que el patrono debe pagar salarios por un período en que el empleado no rinde servicios. Por supuesto, muchas formas de reglamentación reducen el beneficio neto de una empresa, y, sin embargo, ello no significa invalidez o fragilidad constitucional. Véase, *Queenside Hills Co.* v. *Saxl*, 328 U.S. 80; *California Auto Ass'n* v. *Maloney*, supra. Casi todas las reglamentaciones de los negocios imponen cargas financieras sobre las empresas, sin el pago de compensación. Eso es parte de los costes de nuestra civilización . . . . . . . El bienestar público es un concepto amplio e inclusivo. El bienestar moral, social, económico y físico de la comunidad es parte de ese concepto y su bienestar político es otra parte."

En cuanto a la alegación de que no hubo prueba que sostuviera el sistema de salario mínimo garantizado, los hoteles Hilton y Condado presentaron prueba en cuanto a planes similares, establecidos por ellos. Hubo prueba en cuanto a las necesidades, nivel y condiciones de vida de los empleados y obreros y en cuanto a la situación económica y financiera de los hoteles. A tono con esos factores la Junta podía ejercitar su criterio en cuanto a determinado plan de pago de salarios que tendiese a lograr el propósito legislativo de un nivel de vida adecuado para los trabajadores y que no sacrificase irrazonablemente la estructura y situación económica del negocio de hoteles. Ya hemos visto que no es nuestra misión el fiscalizar la sabiduría intrínseca de esos planes, si ellos caen dentro de los poderes estatutarios y constitucionales de la Junta. Basta decir que la Junta tuvo una base racional en la prueba para establecer el plan en discusión. Tampoco es discriminatorio ese plan entre los obreros.

██ El octavo error señalado es el siguiente:

"Que la Junta recurrida cometió error al fijar los diferentes tipos de salarios mínimo a los hoteles que caen dentro del inciso B(1), (2) y (3) del artículo IV del Decreto impugnado, porque:

"(1) La Junta violó las disposiciones de la sección 12 de la ley, habiendo fijado un salario mínimo más alto que razonablemente puede pagar la industria representada por las empresas incluídas en la clasificación B.

"(2) Que la Junta recurrida violó, además, las disposiciones de la sección 12 de la ley, no tomando en consideración la reducción apreciable de los empleados, que necesariamente resultará de un salario mínimo según fijado en dicha sección B del Artículo IV."

En cuanto a los hoteles donde no se operan casinos o salas de juego de azar, se establece un salario mínimo de 32 centavos por hora en San Juan, 28 centavos en Aguadilla, Arecibo, Bayamón, Caguas, Guayama, Mayagüez y Ponce y 24 centavos en los demás pueblos y ciudades. No se demostró ante la Junta, ni surge del récord, que tal salario mínimo sea más alto que lo que razonablemente pueda pagar la industria representada por las empresas en las poblaciones ya mencionadas, ni que tal salario mínimo envuelva una reducción apreciable de los empleados o empleos.

 Como noveno error se señala lo siguiente:

"Que la Junta recurrida cometió error al aprobar el párrafo B del artículo VIII del Decreto Mandatorio número 22 sobre vacaciones, porque

"(1) Nada hay en la evidencia ante la Junta recurrida para justificar la fórmula de día y cuarto por cada mes en que el obrero haya trabajado por lo menos 120 horas de labor como período de vacaciones, siendo por lo tanto dicha conclusión arbitraria y caprichosa."

El artículo 8(b) del decreto dispone que "todo empleado tendrá derecho a vacaciones con sueldo completo . . . a razón de un día y cuarto (1¼) por cada mes en que haya tenido por lo menos ciento veinte (120) horas de labor". Esta disposición equivale a la concesión de quince días al año en concepto de vacaciones para aquellos empleados que hayan trabajado

por lo menos 120 horas al mes. La concesión de vacaciones con paga o compensación, por un período de quince días al año, es enteramente razonable.(⁹) En *American R. R. Co.* v. *Junta Salario Mínimo*, supra, a la pág. 801, se dice lo siguiente:

". . . . Respecto a lo que sí hay controversia, según ya hemos visto, es sobre el período de vacaciones. No hemos hallado un solo caso en que por disposición expresa de ley se hayan concedido vacaciones similares a las aquí provistas a empleados u obreros de una industria privada. Véanse, sin embargo, *Compañía Popular de Transporte* v. *Unión de Empleados de Transporte et al.*, supra, y *People* v. *Ford Motor Company*, 63 N.Y.S.2d 697 (App. Div. S. Ct. N.Y. 1946). No obstante, las vacaciones fijadas, que como hemos visto ascienden a lo sumo a trece días al año, caen dentro del espíritu y propósito que animó al legislador a aprobar la Ley de Salario Mínimo. Ya hemos indicado que éstos son, en esencia, velar por la salud y seguridad de los empleados y obreros y proteger a éstos en sus medios de vida, en tal forma que no se destruyan las fuentes mismas de empleo y trabajo. Los intervalos destinados al reposo son necesarios para evitar el desgaste físico, el agotamiento de las energías, la vejez prematura y las enfermedades del trabajador. Si bien aparentemente al concederlas se perjudica el patrono, a la larga no hay duda de que redundan en beneficio de éste. Mientras más saludables y fuertes sean los obreros de una industria, mayor será su producción y mejor su labor, menores serán sus ausencias y menor será también el número de accidentes del trabajo. Vacaciones con paga por períodos largos indudablemente redundan en perjuicio de la industria y los negocios. Empero, las aquí concedidas no son irrazonables—13 días al año. Por otra parte, ese corto período de vacaciones anuales a sus empleados no priva a la peticionaria de su propiedad sin el debido proceso de ley, pues al regresar de ellas a sus faenas, con nuevo entusiasmo y con nuevo vigor, éstos compensarán tal vez con creces todo aquello que dejaron de hacer o producir para su patrono. En cuanto

---

(⁹) Se ha sugerido que sería más razonable el fijar las vacaciones a base de por cientos de los distintos salarios de distintos empleados. "Vacation–Pay Policy and Administration", 2 Labor L. J. 742. Pero no es función judicial el aquilatar la sabiduría de los métodos y técnicas utilizados por la Junta, si tales métodos no son arbitrarios y tienen alguna base racional, aun si otros métodos pueden ser más convenientes.

a la peticionaria en sí respecta, la concesión de vacaciones a sus empleados y obreros no es cosa nueva. Las concedidas por el Decreto Número 12 resultan ser, dicho sea de paso, como promedio, menores de las que la propia peticionaria ha venido concediendo a sus empleados. Según el Sr. Totti, ingeniero de la recurrente, las vacaciones concedidas por ésta a los empleados que reciben hasta $11 por semana son de una semana; a los que reciben hasta $18 de dos semanas; a los que reciben hasta $26 de tres semanas y de $26 en adelante de cuatro semanas. Llegamos a la conclusión de que tampoco se ha cometido el segundo error."

Como cuestión de hecho, la Junta consideró prueba en cuanto a los efectos de la concesión de tales vacaciones con paga, conjuntamente con otras disposiciones del decreto, en cuanto a los gastos, ingresos netos y situación económica general de los hoteles. Tal impacto económico de las diversas disposiciones del decreto se comprobó mediante exhibits, estadísticas y otra prueba, sometida a la Junta, siendo analizados los números por la Junta en sus determinaciones de hecho y de derecho y en los diversos apéndices al decreto.

Realmente, la concesión de vacaciones compensadas equivale a la fijación de un salario adicional. *In re Wil-Low Cafeterias*, 111 F.2d 429; 56 C.J.S. 526, sección 96. La fijación de tal salario adicional es cuestión de criterio, plan o conclusión de la Junta, y tal ejercicio de criterio puede basarse en prueba relativa a las necesidades de vida de los empleados y obreros y la situación económica de la empresa, ya que tales factores le sirven de fronteras a una determinación de salarios, incluyendo vacaciones. Incidentalmente, en el decreto se dice lo siguiente:

"E—Otras Condiciones de Labor.

"El Decreto Mandatorio núm. 6 confiere a todo empleado 'permanente' el derecho a vacaciones, con sueldo completo, a razón de 15 días al año. Treinta de las 50 empresas incluídas en el Exhibit J-12 informaron que no concedían licencia por enfermedad a sus empleados. Las restantes 20 informaron que concedían 15 días al año."

■ El décimo error señalado es el siguiente:

"La Junta recurrida cometió error al aprobarse el Párrafo C del artículo VIII del Decreto Mandatorio número 22 sobre licencia por enfermedad. Según aprobado por la Junta dichas disposiciones son arbitrarias y discriminatorias y privan a las recurrentes de la protección de las disposiciones de la Sección 7 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, por los siguientes motivos:

"(1) Que la sección es confusa e imprecisa por cuanto no define las enfermedades que le dan derecho al obrero a la licencia, ni tampoco establece un método razonable y adecuado para probar el hecho de la enfermedad, dando lugar a alentar litigios y a enfermedades fingidas.

"(2) Que nada hay en la evidencia ante la Junta recurrente (sic) para justificar la fórmula de día y cuarto por cada mes en que el obrero haya trabajado por lo menos 120 horas de labor como licencia por enfermedad, siendo por lo tanto dicha conclusión arbitraria y caprichosa.

"(3) Que dicho párrafo C del artículo VIII del Decreto Mandatorio número 22, según promulgado por la Junta recurrida, obliga al patrono a pagar por trabajos no realizados debido a enfermedades por las cuales el patrono viene obligado a pagar de acuerdo con otras leyes, o por las cuales el patrono no viene obligado a pagar, a saber:

"(a) Cualquier accidente ocurrido en el curso ordinario del trabajo y así compensado por la Ley de Compensación de Accidentes del Trabajo, bajo la cual el patrono está obligado a pagar las pólizas correspondientes.

"(b) Cualquier enfermedad resultante del embarazo de la mujer ya cubierto por las disposiciones de la Ley núm. 3 de marzo 13 de 1942, resultando que el patrono tendrá que pagar tiempo y medio a la mujer durante el embarazo.

"(c) Cualquier enfermedad resultante de un accidente no compensable de acuerdo con la Ley de Compensación por Accidentes del Trabajo que excluye los accidentes que ocurren en las siguientes circunstancias:

"(1) Al tratar el obrero o empleado de cometer un delito o de lesionar a su patrono o a cualquiera otra persona, o cuando voluntariamente se causare la lesión.

"(2) Estando el obrero o empleado embriagado, siempre que la embriaguez fuera la causa del accidente.

"(3) Cuando la lesión le haya sido causada al obrero por el acto criminal de una tercera persona.

"(4) Cuando la imprudencia temeraria del obrero o empleado haya sido la única causa de la lesión."

Alegan las recurrentes, en síntesis, que la disposición sobre licencias por enfermedad es demasiado indefinida y no envuelve una fórmula práctica, razonable y equitativa, ya que no contiene un método razonable para que se pruebe el hecho de la enfermedad, y así evitar enfermedades fingidas, y, además, no excluye aquellas enfermedades por las cuales el patrono viene obligado a pagar de acuerdo con otras leyes, ni excluye aquéllas por las cuales no hay obligación patronal de pagar, bajo otras leyes.

El artículo 8(C) del Decreto dispone lo siguiente:

"C—Licencia por Enfermedad

"Todo empleado tendrá derecho a licencia por enfermedad con sueldo completo a razón de un día y cuarto ($1\frac{1}{4}$) por cada mes en que haya tenido por lo menos ciento veinte (120) horas de labor. La licencia por enfermedad no usada por el empleado durante el curso del año quedará acumulada para los años sucesivos hasta un máximo de treinta (30) días, excluyendo los días acumulados durante el año corriente. Salvo en caso de fuerza mayor, el empleado deberá notificar a su patrono el hecho de su enfermedad el mismo día de su ausencia. El sueldo correspondiente a cada día de licencia por enfermedad se computará multiplicando por ocho (8) el tipo por hora regular que estuviera percibiendo el empleado al momento de enfermarse."

En las explicaciones del Decreto, la Junta dijo lo siguiente:

"La disposición sobre la acumulación de los días de licencia por enfermedad (Artículo VIII-C) tiende a corregir el resultado irrazonable que de otro modo se produciría de que un empleado que ha trabajado durante un año sin haberse enfermado y se enferma al comienzo del siguiente año no tenga derecho a licencia por enfermedad por haber caducado la que acumuló durante el transcurso de todo el año anterior en que no se había enfermado.

"El derecho del empleado a licencia por enfermedad y la obligación del patrono a concedérsela no deben hacerse depender

exclusivamente de la comprobación médica de la enfermedad. Sería irrazonable tal comprobación en aquellos casos de enfermedad en que aun cuando el empleado no puede ir al trabajo la enfermedad no requiere necesariamente atención médica. Desde luego, el que no se exija la comprobación médica en todos los casos no significa que en algunos esa no sea la forma en que el empleado deba probar su enfermedad para tener derecho a la licencia. La disposición que discutimos no hace exclusión de la comprobación médica en los casos de enfermedad en que razonablemente esa sea la prueba que deba producirse ni impide que el patrono exija tal comprobación a su entero costo cuando lo estime conveniente."

Al igual que lo que hemos expuesto en cuanto a vacaciones, aun si la ley no hace mención expresa en cuanto a licencias por enfermedad, la Junta tenía la facultad implícita de incluir en su decreto una disposición en cuanto a licencias compensadas por enfermedad, como parte del sistema total de salario mínimo, o sea, como ingrediente del salario mínimo, a los fines de lograr los objetivos estatutarios de atender a las necesidades básicas de los empleados, fijándole un salario mínimo en forma razonablemente compatible con el bienestar y la estabilidad económica de la industria. Al igual que lo hizo con las vacaciones compensadas, la Junta expresamente consideró el efecto sobre los gastos e ingresos de la industria de la disposición relativa a licencias por enfermedad, conjuntamente con otras disposiciones relativas al salario mínimo, y llegó la Junta a la conclusión de que todas esas disposiciones eran compatibles con el disfrute de un beneficio razonable por la industria. La concesión en sí de licencias compensadas por enfermedad no es irrazonable. Los trabajadores no son responsables por el hecho de enfermarse.[10] Su condición

---

[10] Naturalmente, si el obrero es responsable intencionalmente por su propia enfermedad, podría alegarse razonablemente que él no debe tener derecho a una licencia compensada. Pero esa situación debería resolverse administrativa o judicialmente cuando surja cada caso, de acuerdo con los hechos envueltos en cada caso específico. La posibilidad de una excepción implícita no implica la nulidad de la regla en cuanto a licencias por enfermedad.

o situación económica no es lo suficientemente adecuada para permitirles el asumir las cargas de una enfermedad, con la correspondiente inactividad, sin recibir ingresos durante ese período de tiempo. De otro lado, el patrono disfruta de la facultad de utilizar nuevamente los servicios de esos trabajadores una vez ellos hayan recuperado su salud. Las enfermedades son riesgos anticipables de la vida, y no es irrazonable el que el patrono asuma el gravamen de esos riesgos como parte de un sistema general de salario mínimo, si, de otro lado, la situación económica del patrono no queda indebida y arbitrariamente menoscabada.

En cuanto a la alegación de que la fórmula de licencias por enfermedad es demasiado indefinida, quedando las puertas abiertas para enfermedades ficticias, debemos decir que una disposición administrativa contenida en un decreto no debe ser demasiado específica y detallada, especialmente en cuanto a enfermedades, con todos sus aspectos médicos y científicos. El decreto obviamente se refiere a enfermedades auténticas. Una formulación detallada de esa modalidad debe dejarse en el ámbito de la actuación administrativa, mediante los reglamentos correspondientes. Si no es genuina una alegación de enfermedad ello debe resolverse judicial o administrativamente en cada caso específico que surja. Basta que indiquemos que el hecho de que una disposición decretal se preste a reclamaciones ficticias no conlleva la nulidad de tal disposición ni implica que la Junta haya actuado en exceso de sus facultades y poderes.

Alega la recurrente que es irrazonable y arbitraria la disposición de licencias por enfermedades en tanto pueda ser aplicable a enfermedades ocupacionales y accidentes sufridos bajo a Ley de Compensaciones por Accidentes del Trabajo. Tiene razón la recurrente en cuanto a que el artículo 8(C) del decreto no debe ser interpretado en el sentido de incluir tales enfermedades que son compensables bajo la ley citada, ya que no se debería obligar al patrono a pagar dos

veces por la misma enfermedad. La conclusión a que hemos llegado en cuanto a este particular no conlleva la invalidez o nulidad del referido artículo 8(C) del decreto sino que más bien implica que esa disposición debe ser leída e interpretada como conteniendo la limitación implícita al efecto de que el referido artículo 8(C) no es, ni puede ser, extensivo a enfermedades y accidentes compensables bajo la Ley de Compensaciones por Accidentes del Trabajo.

*Por los fundamentos expuestos en esta opinión, debe desestimarse y declararse sin lugar el recurso de revisión interpuesto en este caso; sin embargo, en el día de hoy hemos resuelto el caso de Condado Beach Hotel Co. v. Junta de Salario Mínimo y en esa opinión hemos decidido que debe anularse el artículo 6 del decreto mandatorio núm. 22. Haciendo extensivo ese dictamen al caso de autos, debe anularse el artículo 6 del Decreto mandatorio núm. 22 aprobado el 6 de agosto de 1952 y debe decretarse la validez de la totalidad de las demás disposiciones de dicho decreto.*